UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
RANK GROUP LIMITED,                              :
                                                 :
                              Plaintiff,         :   Index No. 12 CIV 3769 (GBD)
                                                 :
                                                 :   ECF Case
         - against -                             :
                                                 :
ALCOA INC.,                                      :   **COMPLAINT**
                                                 :
                              Defendant.         :
                                                 :
------------------------------------------------------------ x

      Plaintiff Rank Group Limited ("Rank" or "Purchaser"), by and through its undersigned counsel, as its Complaint against Defendant Alcoa Inc. ("Alcoa" or "Seller"), alleges as follows:

**NATURE OF THE CASE**

      1.     This is a breach of contract action resulting from Alcoa's refusal to honor certain indemnification provisions of the December 21, 2007 Acquisition Agreement between the parties (as amended, the "Acquisition Agreement"), by which Rank agreed to purchase Alcoa's Packaging & Consumer business – including the Reynolds Wrap brand – on the condition, among others, that Alcoa fully indemnify Rank for certain tax liabilities.

      2.     Alcoa's Packaging & Consumer business (the "Packaging & Consumer Business" or the "Business") had subsidiaries and operations around the world. Rank and Alcoa understood that, because the closing of the transaction (the "Closing") would be

occurring early in calendar year 2008, it was likely that various subsidiaries of the Packaging & Consumer Business would be required to pay taxes *after* the Closing that in fact were incurred *on or before* the closing date (a "Pre-Closing Date Tax Period"). The parties agreed that Rank, as the buyer, should not be responsible for such pre-purchase taxes, and thus Alcoa agreed in the Acquisition Agreement to indemnify Rank for any taxes imposed on any of the newly-acquired subsidiaries for a Pre-Closing Date Tax Period (Section 13.01(a)(i)). (A copy of the Acquisition Agreement is attached as Exhibit 1.)

3.  In addition, the Acquisition Agreement provided that Alcoa would indemnify Rank for tax liabilities imposed for tax periods after the Closing (a "Post-Closing Date Tax Period") if they arose from or were attributable to restructuring actions that Rank permitted Alcoa to take after signing of the Acquisition Agreement (the "Post-Signing Restructuring Actions"). These Post-Signing Restructuring Actions were designed by Alcoa and its advisors primarily to enable Alcoa to transfer cash out of the subsidiaries that were conducting the Business. Rank agreed to allow Alcoa to carry out the Post-Signing Restructuring Actions – subject to the right of tax indemnification – because the agreed-upon purchase price was based on the Business not retaining any cash at the Closing. Alcoa's right to perform these restructuring steps was memorialized in Section 7.03 of the Acquisition Agreement, and Alcoa's obligation to indemnify Rank for taxes arising from or attributable to the Post-Signing Restructuring Actions was set forth in Section 13.01(a)(iv) of the Acquisition Agreement.

4.    One of Alcoa's Post-Signing Restructuring Actions involved the transfer of approximately US $34 million from Alcoa's Chilean subsidiary, Alusud Embalajes Chile Ltda. ("Alusud Chile") to its immediate parent company (the "2008 Loan Transaction"), which was memorialized in a loan agreement dated as of January 29, 2008 (the "2008 Loan Agreement").  At the time, Alcoa knew that there was a significant risk that the 2008 Loan Transaction would not be treated by Chilean tax authorities as a loan but as a profit distribution to its parent company, which would give rise to a substantial tax liability.

5.    In September 2010, the Chilean tax authorities notified Alusud Chile that they had reviewed the 2008 Loan Transaction and determined that it constituted a profit distribution, for which they sought to impose a tax liability of nearly US $15 million, including interest and fines (the "Tax Claim").

6.    Under the plain, unambiguous language of the Acquisition Agreement, Alcoa was obligated to indemnify Rank for the tax liability resulting from the 2008 Loan Transaction.  Rank promptly notified Alcoa of the Tax Claim and demanded that Alcoa assume responsibility for the defense of the Tax Claim and payment of any resulting tax.  Alcoa refused to assume responsibility for the defense of the Tax Claim and disclaimed any obligation to indemnify Rank for any resulting liability.  Rank therefore undertook to defend the Tax Claim and negotiated a substantial reduction in the interest and fines, which reduced the total amount payable to $10,139,883 (excluding amounts for which Rank does not seek indemnification).  Alusud Chile, now an affiliate of Rank, together

with another subsidiary acquired in the transaction, paid this amount (the "Chilean Tax") on April 19, 2011.

7. Alcoa, having received the benefit of the sale of the Business and the transfer of cash as part of the Post-Signing Restructuring Actions, has now refused to comply with its indemnification obligation with respect to the Chilean Tax liability, in violation of the Acquisition Agreement. Alcoa's failure to abide by the unambiguous terms of the Acquisition Agreement has directly and proximately caused damage to Rank in the amount of the $10,139,883 that Alusud Chile and its parent company paid to the Chilean tax authorities to settle the Tax Claim, in addition to expenses incurred by Rank and Alusud Chile to defend the Tax Claim and pursue their indemnification claim against Alcoa. Rank brings this action to recover those damages for Alcoa's breach of the Acquisition Agreement.

**PARTIES**

8. Rank is a privately held investment company organized under the laws of New Zealand and based in Auckland, New Zealand. Through the companies it owns and controls, Rank operates internationally in the packaging, consumer goods, building supplies, and automotive aftermarket industries.

9. Alcoa is a corporation organized under the laws of the State of Pennsylvania. Alcoa and its subsidiaries have done and are doing business in the State of New York. Such business includes maintaining a corporate office, Alcoa Global Center, which is located in this District, and operating manufacturing facilities within New York State.

## JURISDICTION AND VENUE

10. Personal jurisdiction over the defendant is proper in this Court because Alcoa conducts business in the State of New York and because events giving rise to this action, including the principal closing of the Transaction, occurred in New York.

11. Personal jurisdiction over the defendant is proper also because Alcoa agreed in Section 17.11 of the Acquisition Agreement to irrevocably submit itself to the jurisdiction of this Court. The relevant portion of Section 17.11 of the Acquisition Agreement provides:

> Each party irrevocably submits to the exclusive jurisdiction of (i) the Supreme Court of the State of New York, New York County, and (ii) the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby (and each agrees that no such action, suit or proceeding relating to this Agreement shall be brought by it or any of its Affiliates except in such courts).

12. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the controversy is between a citizen of a State and a citizen of a foreign state and Plaintiff seeks damages in an amount well in excess of $75,000.

13. Venue is proper under 28 U.S.C. § 1391, as Alcoa is a corporation subject to personal jurisdiction in this District, and, therefore, is deemed a resident of this District pursuant to 28 U.S.C. § 1391(c).

14. Venue in this district is proper also because in Section 17.11 of the Acquisition Agreement Alcoa irrevocably and unconditionally waived any objection to the laying of venue in an action such as this one brought in this Court. The relevant portion of Section 17.11 of the Acquisition Agreement provides:

> Each party irrevocably and unconditionally waives (and agrees not to plead or claim) any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the Supreme Court of the State of New York, New York County or (ii) the United States District Court for the Southern District of New York or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

## BACKGROUND

**The Acquisition Agreement**

15. On December 21, 2007, Alcoa and Rank entered into the Acquisition Agreement, pursuant to which Rank acquired the more than 25 subsidiaries of Alcoa that made up the Packaging & Consumer business (defined in the Acquisition Agreement as the "Transferred Subsidiaries"). Rank agreed to pay Alcoa approximately US $2.7 billion for the Packaging & Consumer Business.

16. The Transferred Subsidiaries included a company then named Alcoa Latin American Holdings Corporation, which is incorporated in the British Virgin Islands and which subsequently was renamed CSI Latin American Holdings Corporation ("CSI LAHC"). CSI LAHC was and remains the parent company of Alusud Chile (also a Transferred Subsidiary) through its 99.3% ownership interest.

17. As is common in large corporate acquisitions, the Acquisition Agreement contemplated that there would be a period between the execution of the Acquisition Agreement, on December 21, 2007, and the Closing, which occurred on February 29, 2008. During this period, Alcoa intended to, and did, perform certain Post-Signing Restructuring Actions. As described above, these Post-Signing Restructuring Actions were designed and

undertaken for Alcoa's benefit, with the overall purpose of removing cash from the Transferred Subsidiaries before Closing.

**The Tax Indemnification Provisions**

18. The Acquisition Agreement specifically provided protection to Rank in the event that the Business was required after Closing to pay any tax liabilities that either were incurred during the period before the Closing when Alcoa owned the Business or resulted from a Post-Signing Restructuring Action.

19. Section 13.01(a)(i) of the Acquisition Agreement required Alcoa to indemnify and hold harmless Rank and its Affiliates, including the Transferred Subsidiaries, for

> **any Loss to the extent attributable to: (i) any Taxes imposed on or with respect to any Transferred Subsidiary (or for which any Transferred Subsidiary is otherwise liable), as the case may be, with respect to any Pre-Closing Date Tax Period** (including, for the avoidance of doubt, any interest, penalty or addition to Tax accruing after the Closing Date on any Taxes for which Seller is liable under this Section 13.01(a)(i)), including any such liability arising under principles of transferee or successor liability . . . . (emphasis added).

20. The term "Losses" was defined in the Annex to the Acquisition Agreement to include "all losses, liabilities, claims, causes of action, costs or expenses (including reasonable attorneys' fees, accountants' fees and costs of investigation) . . ." (Acquisition Agreement, Annex 1).

21. The clear intent of Section 13.01(a)(i) was to ensure that Alcoa, not Rank, would be responsible for taxes and Losses related thereto that were incurred as a result of

7

actions taken by Alcoa during the period when it still owned and operated the Packaging & Consumer Business.

22. In addition, Section 13.01(a)(iv) of the Acquisition Agreement provided that:

> From and after the applicable Closing, **Seller shall indemnify Purchaser and its Affiliates (including the Transferred Subsidiaries) against and hold them harmless from any Loss to the extent attributable to:**
>
> **(iv) Taxes arising from or attributable to any Post-Signing Restructuring Action** other than (A) any such Taxes for a Post-Closing Date Tax Period arising from or attributable to Purchaser or any of its Affiliates (including any Transferred Subsidiary) having a lower Tax basis in any Acquired Asset or in the stock of any Transferred Subsidiary than would otherwise have existed if no Post-Signing Restructuring Actions had been undertaken, (B) any such Taxes for a Post-Closing Date Tax Period that would not have arisen but for any action taken by the Purchaser or any of its Affiliates (including any Transferred Subsidiary) other than in the ordinary course of business (and, for the avoidance of doubt, any restructuring conducted by Purchaser or any of its Affiliates (including any Transferred Subsidiary) after the applicable Closing shall not be in the ordinary course) and (C) any such Taxes for a taxable period (or portion thereof) beginning after December 31, 2008. . . . (emphasis added).

23. The plain purpose and meaning of this provision was to ensure that Alcoa bore all liability for taxes imposed on Rank or the Transferred Subsidiaries, and losses related thereto, for any tax period through the end of 2008 as a result of the Post-Signing Restructuring Actions undertaken by Alcoa (subject to certain narrow exceptions). In other words, Rank was willing to allow Alcoa to restructure the Business and remove cash before the purchase, but only if those transactions would not make Rank responsible for any additional tax liabilities after the purchase.

**The 2008 Loan Transaction**

24. One of the Post-Signing Restructuring Actions outlined in Alcoa's 87-page "Restructure Plan," which was set forth in Attachment 7.03 to the Seller Disclosure Letter, was the 2008 Loan Transaction described above. According to the Restructure Plan, two other Alcoa subsidiaries, Alusud Uruguay SRL and Aluminerie Lauralco, were to repay loans totaling approximately $31,200,000 owed to Alusud Chile, which then would lend that amount to CSI LAHC. In fact, the two subsidiaries did not repay the loans to Alusud Chile, but instead CSI LAHC assumed their payment obligations to Alusud Chile. Alusud Chile then transferred an additional $3,002,166 in cash to CSI LAHC. The total amount of these three loans, US $34,409,550.52, was reflected in the new 2008 Loan Agreement. Prior to the Closing, CSI LAHC transferred this amount, along with other funds, to Alcoa.

25. Alcoa and its pre-Closing subsidiaries were entirely responsible for designing the 2008 Loan Transaction. Specifically, Alcoa was responsible for choosing to structure the transaction as a loan from Alusud Chile to its direct parent company, CSI LAHC.

26. At the time, Alcoa's tax advisors warned that structuring the transaction as a subsidiary-to-parent loan created a significant risk that the transaction would be treated as a dividend or other profit distribution, thereby creating a substantial Chilean tax liability, and cautioned against using this structure. But Alcoa carried out the 2008 Loan Transaction anyway.

27. On February 29, 2008, the sale of the Packaging & Consumer Business closed. Rank fully performed its Closing obligations under the Acquisition Agreement, and has continued to perform its obligations under the Agreement since that time.

28. The 2008 Loan Agreement contemplated that the parties could amend the agreement, so long as they did so in writing: "No amendments to . . . this Agreement shall be effective unless made in writing and signed by the parties hereto." (Section 10). As part of the ordinary course of their business, Alusud Chile and CSI LAHC amended the 2008 Loan Agreement as expressly permitted by Section 10 of the 2008 Loan Agreement, in an amendment dated as of January 29, 2009 (the "Loan Amendment"). Among other things, the Loan Amendment modified the interest rate and extended the term of the loan to four years.

29. Both Alusud Chile and CSI LAHC have performed all of their obligations under the 2008 Loan Agreement, as amended by the Loan Amendment.

**The Imposition of the Chilean Tax**

30. On September 27, 2010, Alusud Chile received notification from the Chilean tax authority, Servicio de Impuestos Internos ("SII"), that it had begun an audit of Alusud Chile for the tax years 2009 and 2010, which corresponded to calendar years 2008 and 2009. Since this audit involved (a) a Transferred Subsidiary and (b) the Pre-Closing Tax Date Period of January 1, 2008 through February 29, 2008, Rank realized that it could give rise to taxes covered by the indemnification provisions in Section 13.01(a) of the Acquisition Agreement. Accordingly, Rank gave written notice of the audit to Alcoa, in accordance with Section 13.07(a) of the Acquisition Agreement, by

letter dated October 29, 2010.  Pursuant to Section 13.07(b) of the Acquisition Agreement, which provides that "The Tax Indemnitor shall, at its own expense, assume control of the defense of any Tax Claim for any Indemnifiable Tax," Rank asked Alcoa to "confirm Alcoa is assuming control of the defence of this Tax Claim to the extent it relates to the Pre-Closing Date Tax Period."

31. Three months later, by letter dated January 28, 2011, Alcoa rejected this demand, in breach of its obligations under Section 13.07(b) of the Acquisition Agreement, leaving Rank and Alusud Chile with no choice but to assume control of the defense of the audit.  Rank notified Alcoa, by letter dated February 2, 2011, that because Alcoa had refused to fulfill its obligation under the Acquisition Agreement to assume responsibility for defense of the audit and any resulting tax claims, Rank would defend the audit and tax claims to protect its and Alusud Chile's interests, while reserving all rights under the Acquisition Agreement.

32. Rank and Alusud Chile engaged tax advisors and counsel in Chile to assess SII's potential claims and try to minimize any liability that might result from the audit.

33. In the course of the audit, SII reviewed the 2008 Loan Transaction and, as Alcoa's advisors had warned before the Closing, asserted that under Chilean tax law this Post-Signing Restructuring Action by Alcoa constituted a profit distribution from Alusud Chile to its immediate parent, CSI LAHC.  Under Chilean tax law, loans from a subsidiary company to a parent company are treated as profit distributions and therefore

11

are subject to a dividend withholding tax on the payor (Alusud Chile) and a tax on the recipient (CSI LAHC).

34. On February 22, 2011, Alusud Chile's representatives met with officials from SII to discuss the audit and, specifically, SII's claim that the 2008 Loan Transaction gave rise to a dividend withholding tax obligation. At the meeting, SII reiterated its position that the 2008 Loan Transaction by which Alusud Chile lent funds to CSI LAHC was a taxable profit distribution under Chilean law.

35. SII demanded payment not only of the dividend tax of 4,679,373,849 Chilean Pesos ("CLP") in tax for tax year 2009 (which related to calendar year 2008), but also interest and fines in the amount of CLP 1,923,380,629. After significant negotiations, Rank representatives were able to reach an agreement with SII whereby Alusud Chile and CSI LAHC agreed to pay their respective portions of the dividend tax, in exchange for the waiver by SII of 93% of the otherwise applicable interest and fines referred to above – a saving of CLP 1,788,743,985, or approximately $3,767,680 at the then-prevailing exchange rate (calculated using the April 19, 2011 exchange rate of CLP 474.76 to USD 1).

36. On April 19, 2011, SII issued an assessment against Alusud Chile in the amount of CLP 3,981,214,217 for tax year 2009 (calendar year 2008), representing the amount owed by Alusud Chile as withholding agent for the profit distribution to CSI LAHC pursuant to the 2008 Loan Transaction, including the 93% reduction of the penalties and interest. The component parts of that assessment were as follows:

12

| Withholding Tax | CLP 3,762,939,636 |
|---|---|
| Adjustments | CLP 120,414,068 |
| Interest and Fines | CLP 1,398,007,333 |
| 93% Remission | CLP (1,300,146,820) |
| **Total Amount Due** | **CLP 3,981,214,217** |

37. A separate assessment was levied against CSI LAHC for CLP 832,796,276 (reflecting the 93% reduction of fines and interest) for tax year 2009 (calendar year 2008) as the recipient of the profit distribution pursuant to the 2008 Loan Agreement. The component parts of that assessment against CSI LAHC were as follows:

| Withholding Tax | CLP 771,337,350 |
|---|---|
| Adjustments | CLP 24,682,795 |
| Interest and Fines | CLP 525,373,296 |
| 93% Remission | CLP (488,597,165) |
| **Total Amount Due** | **CLP 832,796,276** |

38. On April 19, 2011, to avoid further interest and penalties and to preserve the beneficial compromise reached with SII to waive 93% of the potentially applicable interest and penalties, Alusud Chile and CSI LAHC paid the taxes based on the 2008 Loan Transaction for tax year 2009 (calendar year 2008) in the following amounts:

| Entity | CLP | USD (based on April 19, 2011 exchange rate = CLP474.76/USD1) |
|---|---|---|
| Alusud Chile | 3,981,214,217 | 8,385,740.62 |
| CSI LAHC | 832,796,276 | 1,754,141.62 |
| **TOTAL** | **4,814,010,493** | **10,139,882.24** |

39. In August 2011, SII sent Alusud Chile a final notice of review completion, in which it reviewed the tax claims. This SII notice again made it clear that the 2008 Loan Transaction, as memorialized in the 2008 Loan Agreement, triggered the tax liability. This notice did not mention the Loan Amendment.

13

**Alcoa's Obligation to Indemnify Rank for the Chilean Taxes**

40. Alcoa has an unambiguous and binding obligation under the Acquisition Agreement to indemnify Rank for the full amount of the Chilean Tax payments set forth in paragraph 38 above, for two independent reasons.

41. First, the Chilean Tax was "imposed on or with respect to [a] Transferred Subsidiary . . . with respect to [a] Pre-Closing Date Tax Period" (Section 13.01(a)(i)). Alusud Chile and CSI LAHC are both Transferred Subsidiaries under the Acquisition Agreement. The event that triggered the tax, the 2008 Loan Transaction, occurred prior to the Closing. Tax year 2009 (which relates to calendar year 2008) was a Straddle Tax Period, as defined in the Acquisition Agreement to mean "any complete Tax period that includes but does not end on the Applicable Closing Date" for any Transferred Subsidiary (Acquisition Agreement, Annex 1). The definition of Pre-Closing Date Tax Periods for any Transferred Subsidiary includes "the portion of any Straddle Tax Period ending on [the] applicable Closing Date" for such Transferred Subsidiary (Acquisition Agreement, Annex 1), and the tax for a Straddle Tax Period that relates to the Pre-Closing Date Tax Period is "the amount that would be payable if the relevant Tax period ended on the applicable Closing Date" (Acquisition Agreement, § 13.01(c)(ii)). Thus, the tax was imposed with respect to a Pre-Closing Date Tax Period, and Alcoa is obligated to indemnify Rank for the Chilean Tax pursuant to the indemnification clause in Section 13.01(a)(i) of the Acquisition Agreement.

42. Second, the Chilean Tax was "attributable to [a] Post-Signing Restructuring Action," the 2008 Loan Transaction memorialized in the 2008 Loan

14

Agreement. Pursuant to Section 13.01(a)(iv) of the Acquisition Agreement, Alcoa is obligated to indemnify Rank for all such liabilities, with only three narrow exceptions, none of which applies here.

**Alcoa's Breaches of Its Contractual Duties**

43. Rank has repeatedly notified Alcoa in writing and orally of the Chilean Tax and demanded that Alcoa pay this tax or indemnify Rank for its payment (after Rank's Affiliates paid the Chilean Tax), including by letters dated October 29, 2010, February 2, 2011, July 6, 2011 and November 18, 2011.

44. Alcoa has not paid any portion of the Chilean Tax, nor has it reimbursed Rank for any portion of the Chilean Tax or the expenses incurred by Rank and its Affiliates to defend the Tax Claim. Instead, Alcoa has refused to comply with the Acquisition Agreement and has disclaimed any responsibility for indemnification of the Chilean Tax. The reasons given by Alcoa for its refusal to comply with the terms of the Agreement are groundless.

45. Alcoa's failure to indemnify Rank for the Chilean Tax is a breach of both Sections 13.01(a)(i) and 13.01(a)(iv) of the Acquisition Agreement.

46. These breaches have already caused damage to Rank in the amount of US $10,139,882.24, in addition to interest and the expenses incurred by Rank and its subsidiaries to defend the Tax Claim.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT
## (SECTION 13.01(a)(i))

47.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

48.     Alcoa agreed, in Section 13.01(a)(i) of the Acquisition Agreement, to indemnify Rank and hold Rank harmless for any "Loss" attributable to "any Taxes imposed on or with respect to any Transferred Subsidiary (or for which any Transferred Subsidiary is otherwise liable), as the case may be, with respect to any Pre-Closing Date Tax Period . . . ."

49.     The Chilean Tax was imposed on or with respect to Alusud Chile and CSI LAHC—Transferred Subsidiaries under the Acquisition Agreement—as a result of the 2008 Loan Transaction, which occurred during a Pre-Closing Date Tax Period (the portion of 2008 prior to the Closing).  Accordingly, Alcoa is obligated to indemnify Rank for payment of the Chilean Tax and expenses associated therewith pursuant to Section 13.01(a)(i) of the Acquisition Agreement.

50.     Rank has fully performed all of its obligations under the Acquisition Agreement.

51.     Rank and its Affiliates have paid a total of US $10,139,882.24 in taxes, fines and interest with respect to the Tax Claim, and Rank has demanded indemnification of that payment from Alcoa, plus expenses incurred by Rank and its Affiliates, and interest, in a letter dated November 18, 2011 (attached as Exhibit 2).

52.     Alcoa, without any sufficient excuse, has refused to honor its indemnification obligation as described above.  Alcoa has thereby breached Section 13.01(a)(i) of the Acquisition Agreement.  Alcoa's breach has directly and proximately caused damage to Rank.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT
## (SECTION 13.01(a)(iv))

53.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

54.     Alcoa agreed in Section 13.01(a)(iv) of the Acquisition Agreement to indemnify Rank and hold Rank harmless for any "Loss" attributable to "[t]axes arising from or attributable to any Post-Signing Restructuring Action," with certain exceptions not applicable here.

55.     The 2008 Loan Transaction was a Post-Signing Restructuring Action that resulted in the imposition of the Chilean Tax.  Accordingly, Alcoa is obligated to indemnify Rank for its payment of the Chilean Tax and expenses associated therewith pursuant to Section 13.01(a)(iv) of the Acquisition Agreement.

56.     Rank and its Affiliates have paid a total of US $10,139,882.24 in taxes, fines and interest with respect to the Tax Claim, and Rank has demanded indemnification of that payment from Alcoa, plus expenses incurred by Rank and its Affiliates, and interest, in a letter dated November 18, 2011 (attached as Exhibit 2).

57.     Alcoa, without any sufficient excuse, has refused to honor its indemnification obligation as described above.  Alcoa has thereby breached Section

13.01(a)(iv) of the Acquisition Agreement.  Alcoa's breach has directly and proximately caused damage to Rank.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment awarding Rank:

(1) Compensatory damages and other damages available by law in an amount to be proved at trial, plus pre-judgment interest as permitted by law;

(2) Plaintiff's attorneys' fees, costs, and other expenses; and

(3) Such other and further relief as is just and proper.

Dated:   New York, New York
         May 11, 2012

DEBEVOISE & PLIMPTON LLP

By:  /s/ Gary W. Kubek
    Gary W. Kubek (gwkubek@debevoise.com)
    Vanessa De Simone (vsdesimo@debevoise.com)
    Joshua Weigensberg (jweigens@debevoise.com)

919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Plaintiff Rank Group Limited