UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                        :

RANK GROUP LIMITED,                   :
                        :

                 Plaintiff,    :

                        :

         - against -           :

                        :

ALCOA INC.,                      :
                        :

                 Defendant.   :
                        :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/19/2018

12-CV-3769 (VSB)

**OPINION & ORDER**

Appearances:

Gary W. Kubek
Joshua Avram Weigensberg
Debevoise & Plimpton, LLP
New York, NY
*Counsel for Plaintiff*

Peter Nicholas Flocos
K&L Gates LLP
New York, NY
*Counsel for Defendant*

Andrew R. Stanton
Lauren Garraux
Thomas Edward Birsic
K&L Gates LLP
Pittsburgh, PA
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Rank Group Limited ("Rank") brings this action against Defendant Alcoa Inc.

("Alcoa") for breach of contract with respect to indemnification provisions contained in an

acquisition agreement entered into by the parties on December 21, 2007 (the "Acquisition

Agreement"), pursuant to which Rank purchased Alcoa's Packaging & Consumer and Closure

Systems International business (the "Acquisition"). Rank claims that Alcoa is obligated under

the Acquisition Agreement to indemnify Rank for certain Chilean tax liabilities and related expenses. Alcoa argues that it is not obligated to indemnify Rank because the Chilean tax liabilities occurred as a result of Rank's breach of a purchaser covenant in the Acquisition Agreement. The core question that must be answered to resolve the dispute between the parties is whether Alcoa's indemnification obligation is excused by actions taken by Rank. I find that Alcoa does not owe indemnification to Rank. Accordingly, and for the reasons described below, I direct that judgment be entered in favor of Alcoa.

## I.     Procedural History

Rank brought this lawsuit against Alcoa on May 11, 2012. (Doc. 1.) On July 9, 2012, Alcoa filed a motion to dismiss and supporting papers seeking to dismiss the complaint for failure to state a claim. (Docs. 15–17.) Specifically, Alcoa argued that Rank's complaint failed to state a prima facie claim for indemnification under the provisions of the Acquisition Agreement. (Doc. 17 at 10–17.) Rank filed its opposition brief on July 30, 2012, (Doc. 19), and Alcoa filed its reply on August 13, 2012, (Doc. 20). Oral argument was held on August 22, 2012, before Judge George B. Daniels.[1] Judge Daniels denied the motion to dismiss stating the basis for the denial at the conclusion of oral argument, (Doc. 24 at 65–68), and issued an order documenting the denial later that same day, (Doc. 21). Alcoa filed its answer on September 7, 2012. (Doc. 23.)

On September 28, 2012, Alcoa filed a motion requesting the issuance of a letter rogatory and supporting papers, (Docs. 26–28), "for (i) the production of documents, and (ii) the taking of oral testimony under oath of a representative(s) of Servicio de Impuestos Internos."[2] (Doc. 26.)

---

[1] The case was originally assigned to Judge George B. Daniels. It was reassigned to Judge Edgardo Ramos on July 17, 2013, and reassigned to me on February 5, 2014.

[2] The Servicio de Impuestos Internos is the Chilean tax authority.

Rank filed its response on October 9, 2012, (Doc. 30), and Alcoa filed its reply on October 11, 2012, (Doc. 31). Rank did not object to the issuance of a letter rogatory, but reserved its right to object to the disclosure of information as protected or privileged under Chilean law before the appropriate Chilean judicial authority and requested that the proposed request be revised. (Doc. 31 at 1–3.) On December 3, 2012, Judge Daniels issued an Order Directing Issuance of Letter Rogatory, (Doc. 32), and that same day issued the Request For International Judicial Assistance (Letter Rogatory) To Take Evidence Abroad Of Servicio De Impuestos Internos, (Doc. 33). The letter rogatory was returned on March 12, 2014. (Dkt. Entry Mar. 12, 2014.)

The parties submitted a joint letter on June 19, 2014, requesting a telephone conference to discuss whether I had a preference regarding the filing of summary judgment motions in cases set for bench trial. (Doc. 74.) I granted the request and scheduled a telephone conference for June 25, 2014. (Doc. 75.) During the June 25 conference, the parties agreed to postpone the decision regarding whether to file summary judgment motions until completion of expert discovery, and I set a conference for August 8, 2014. At the August 8 conference, the parties agreed to proceed to trial without filing summary judgment motions. By joint letter dated August 28, 2014, the parties informed me that they were available for trial during the week of January 26, 2015. (Doc. 77.)

On November 26, 2014, Alcoa and Rank each filed their pretrial memoranda, (Docs. 85, 87), and their proposed joint pretrial order, (Doc. 86). Alcoa and Rank filed their respective responses to the other's pretrial memoranda on December 19, 2014. (Docs. 88, 89.)

The bench trial began on January 26 and ended on January 30, 2015. Rank called the following witnesses: Gregory Cole, a senior officer at Rank who was involved in the negotiation of the Acquisition Agreement as well as other events relevant to the claims in this lawsuit; C.J.

Getz, an accounting and tax professional who was one of Rank's advisors at Deloitte LLP ("Deloitte") at the time of the Acquisition and by the time of trial had become a senior Rank employee; Santiago Borja, the former Latin American Regional Finance Controller for Rank; and Rodrigo Stein, a partner in the Tax and Legal division of KPMG Auditores Consultores Ltda, who Rank called as an expert witness. Alcoa called the following witnesses: Max Laun, Esq., Vice President and General Counsel of Alcoa; Scott M. Zahorchak, Alcoa's Director of International Tax; Eduardo S. Doria, Alcoa's Tax Director of Latin America; Francisca Perez, a partner at Morales & Besa in Santiago, Chile, who Alcoa called as an expert witness; and Fernando Barros, a partner at Barros & Errázuriz in Santiago, Chile, who Alcoa also called as an expert witness. The parties also submitted deposition designations in lieu of live testimony for Marcelo Nascimbem, Legal Counsel for Alcoa Alumínio S.A.; Irene Schmidt, who until her retirement was in Corporate Development at Alcoa; and Mark Dunkley, Rank's Global Head of Tax.

Alcoa and Rank each filed proposed findings of fact and conclusions of law and a post-trial memorandum on March 13, 2015. (Docs. 116, 117, 118, 119.) Alcoa requested leave to file a response to Rank's post-trial memorandum on March 26, 2015, (Doc. 121), and Rank responded to that request that same day objecting to the request but seeking leave to file a response to Alcoa's post-trial memorandum if I granted Alcoa's request, (Doc. 122). Because I believed that short responses by the parties could be informative I granted both parties leave to file responses of no more than six pages. The responses of Alcoa and Rank were filed on March 27, 2015, and April 3, 2015, respectively. (Docs. 124, 125.)

This Opinion & Order constitutes my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## II. <u>Findings of Fact</u>

### A. *The Acquisition and Claims of the Parties*

On December 21, 2007, Rank, a New Zealand-based investment company, and Alcoa, a Pennsylvania corporation, entered into the Acquisition Agreement whereby Rank paid Alcoa $2.7 billion[3] to acquire Alcoa's Packaging & Consumer and Closure Systems International business. (Jt. Fact Stip. ¶¶ 1–4.)[4] The relevant parts of the Acquisition closed on February 29, 2008 (the "Closing Date" or "Closing"), and Rank acquired more than 25 subsidiaries previously owned by Alcoa (the "Transferred Subsidiaries").[5] (*Id.* ¶¶ 3, 6; *see generally* PX6 (Acquisition Agreement).)[6] One of the subsidiaries Rank acquired was Alcoa Latin American Holdings Corporation ("ALAHC").[7] (Jt. Fact Stip. ¶ 5.) ALAHC, a British Virgin Islands corporation, owned 99.3% of Alusud Chile Embajales Ltda. ("Alusud Chile"), an entity formed under Chilean law. (*Id.*)

The Acquisition Agreement identified various transactions that Alcoa had the right to execute in the period between the signing of the Acquisition Agreement and the Closing Date. (*Id.* ¶ 7; *see* PX6 § 7.03(a) ("[Alcoa] shall have the right, after the date of this Agreement and prior to the applicable Closing Date, to undertake, at its own expense, those restructuring steps or other transactions in respect of any Acquired Asset or Transferred Subsidiary . . . that are set

---

[3] Unless otherwise noted, all references to currency are to United States dollars.

[4] "Jt. Fact Stip." refers to Section II, Stipulations of Fact, of the Stipulations of Law and Fact attached as Appendix A to the parties' Joint Pretrial Order. (Doc. 86-1.) The parties entered into this stipulation prior to trial.

[5] "Transferred Subsidiaries" is a defined term in the Acquisition Agreement, and expressly includes ALAHC and Alusud Chile. (Jt. Fact Stip. ¶ 18; *see also* PX6, Annex 1 at ALCOA_RANK0013573.)

[6] The parties submitted two sets of exhibits. The "PX" designation refers to Plaintiff Rank's trial exhibits. The "DX" designation refers to Defendant Alcoa's trial exhibits. Even if the parties have designated the same document, I cite the document only as "PX" or only as "DX" for ease of reference. For example, throughout this Opinion & Order I cite to the Acquisition Agreement as PX6—the Plaintiff's designation.

[7] After Closing, Rank changed ALAHC's name to CSI Latin American Holdings Corporation ("CSI LAHC"). (Jt. Fact Stip. ¶ 5.) For clarity I refer to both CSI LAHC and ALAHC as "ALAHC".

forth in Section 7.03 of the Seller Disclosure Letter (each such step, transaction or Tax election, a 'Post-Signing Restructuring Action').").)  One of the Post-Signing Restructuring Actions was the $34,409,550.52 loan from Alusud Chile to ALAHC, Alusud Chile's direct parent (the "2008 Loan").  (Jt. Fact Stip. ¶ 8.)

In September of 2010, more than two years after the Closing Date, the Chilean tax authority, Servicio de Impuestos Internos ("SII"), commenced an audit of Alusud Chile (the "Audit").  (*Id.* ¶ 15.)  As a result of the Audit, the SII found that the 2008 Loan was a hidden distribution of profits and recharacterized the loan under the Chilean tax laws, thus subjecting Alusud Chile to a tax.  (*Id.* ¶ 16; PX32.)  Rank ultimately settled with the SII by paying a total of $10,139,882.24 in taxes, fines, and interest for the 2008 calendar year related to the 2008 Loan (the "Chilean Tax").  (Jt. Fact Stip. ¶¶ 15–16.)

Rank claims that Alcoa is obligated to indemnify Rank for the Chilean Tax pursuant to two of the Acquisition Agreement's indemnification provisions.  (*See* Rank Mem. at 42–44.)[8]  Those provisions—under Article XIII, Section 13.01, titled "Tax Indemnification"—state in relevant part that:

> (a) From and after the applicable Closing, [Alcoa] shall indemnify [Rank] and its Affiliates (including the Transferred Subsidiaries) against and hold them harmless from any Loss to the extent attributable to:
>
> (i) any Taxes imposed on or with respect to any Transferred Subsidiary (or for which any Transferred Subsidiary is otherwise liable), as the case may be, with respect to any Pre-Closing Date Tax Period (including, for the avoidance of doubt, any interest, penalty or addition to Tax accruing after the Closing Date on any Taxes for which [Alcoa] is liable under this Section 13.01(a)(i)), including any such liability arising under principles of transferee or successor liability . . . .
>
> (iv) Taxes arising from or attributable to any Post-Signing

---

[8] "Rank Mem." refers to Plaintiff's Post-Trial Memorandum of Law.  (Doc. 119.)

Restructuring Action other than (A) any such Taxes for a Post-Closing Date Tax Period arising from or attributable to [Rank] or any of its Affiliates (including any Transferred Subsidiary) having a lower Tax basis in any Acquired Asset or in the stock of any Transferred Subsidiary that would otherwise have existed if no Post-Signing Restructuring Actions had been undertaken, (B) any such Taxes for a Post-Closing Date Tax Period that would not have arisen but for any action taken by [Rank] or any of its Affiliates (including any Transferred Subsidiary) other than in the ordinary course of business (and, for the avoidance of doubt, any restructuring conducted by [Rank] or any of its Affiliates (including any Transferred Subsidiary) after the applicable Closing shall not be in the ordinary course) and (C) any such Taxes for a taxable period (or portion thereof) beginning after December 31, 2008 . . . .

(PX6 § 13.01(a).)[9]

The "Pre-Closing Date Tax Periods" for Transferred Subsidiaries such as ALAHC and Alusud Chile include "all Tax periods ending on or before the applicable Closing Date . . . and the portion of any Straddle Tax Period ending on such applicable Closing Date."[10]  (*Id.*, Annex 1 at ALCOA_RANK0013568.)  A "Straddle Tax Period" is, with respect to a Transferred Subsidiary, "any complete Tax period that includes but does not end on the applicable Closing Date with respect to [the] Country Unit" covering that Transferred Subsidiary.  (*Id.* at ALCOA_RANK0013570.)  The portion of a Tax that is payable for a Straddle Tax Period that relates to the Pre-Closing Date Tax Period is "the amount that would be payable if the relevant Tax period ended . . . on the applicable Closing Date."  (*Id.* § 13.01(c).)  The Chilean tax year for

---

[9] The Chilean Tax is a "Loss" and a "Tax" under the Acquisition Agreement.  (*See* PX6, Annex 1 at ALCOA_RANK0013567 (stating that "Losses" are "all losses, liabilities, claims, causes of action, costs or expenses (including reasonable attorneys' fees, accountants' fees and costs of investigation), whether or not arising from a third party claim"); *see also id.* at ALCOA_RANK0013571 (stating that "Tax" includes "all . . . profits, . . . withholding, . . . and other taxes . . . (including any and all fines, penalties, and additions attributable to or otherwise imposed on or with respect to any such taxes, . . . and interest thereon) imposed by or on behalf of any Governmental Entity").)

[10] "Post-Closing Date Tax Periods" are, conversely, "all Tax periods beginning after the applicable Closing Date . . . and the portion of any Straddle Tax Period beginning after such applicable Closing Date."  (PX6, Annex 1 at ALCOA_RANK0013568.)

2009, which corresponded to calendar year 2008—the year of Closing—was a Straddle Tax Period. (Jt. Fact Stip. ¶¶ 16, 31.) Rank negotiated for Section 13.01(a)(vi)'s indemnification covering taxes arising from the Post-Signing Restructuring Actions. (*See* PX1 at ALCOA_RANK0008580; *see also id.* at ALCOA_RANK0008471 ("[W]e revised [the tax indemnification provision] to ensure it covers various pre-Closing Taxes and Taxes attributable to certain actions taken at or prior to the closing.").)

The tax indemnity provisions encompass a "your watch/my watch" principle pursuant to which Alcoa would be responsible for taxes incurred prior to the Closing Date and Rank would be responsible for taxes incurred subsequent to the Closing Date. (Tr. 361:7-22; *see also id.* at 65:22-66:3.)[11] Alcoa acknowledges that the Chilean Tax arose during a Pre-Closing Tax Period. (*See, e.g., id.* at 391:8-11; Alcoa Mem. at 30.)[12]

Alcoa claims that it is not liable for indemnification based on an exception to Section 13.01, which provides:

> Notwithstanding anything contained in this Section 13.01, [Alcoa] shall not be liable under this Section 13.01 for any liability to the extent attributable to or resulting from . . . a breach by [Rank] or an Affiliate of [Rank] (other than the Transferred Subsidiaries), or, after the applicable Closing, by any of the Transferred Subsidiaries, of any Tax-related covenant contained in this Agreement.

(PX6 § 13.01(a) (the "Section 13.01 Carve-Out").) "Tax-related covenant" is not defined in the Acquisition Agreement. Alcoa argues that the Section 13.01 Carve-Out applies because Rank breached Section 9.02 of the Acquisition Agreement—titled "Performance of Obligations by [Rank] After the Closing Dates"—by amending and failing to pay the 2008 Loan. Specifically,

---

[11] "Tr." refers to the transcript of the bench trial held on January 26, 28, 29, and 30, 2015.

[12] "Alcoa Mem." refers to Defendant Alcoa Inc.'s Post-Trial Briefing Responding to Questions Included in February 5, 2015 Order of Court. (Doc. 116.)

Section 9.02 states:

> From and after the applicable Closing, [Rank] shall cause the Transferred
> Subsidiaries to duly, promptly and faithfully pay, honor, perform and
> discharge all the Assumed Liabilities with respect to each Country Unit
> transferred at such Closing.

(*Id.* § 9.02.)  In other words, "if Rank causes a tax by breaching a tax-related covenant, then Alcoa doesn't owe indemnity for it."  (Tr. 363:5-14.)  The parties agree that the 2008 Loan was an Assumed Liability under the Acquisition Agreement.  (Jt. Fact Stip. ¶ 19; *see* PX6 § 2.02(b).)  The parties also agree that the language contained in Section 9.02 was not the subject of negotiation or discussion between the parties, (Tr. 68:22-69:22 (Cole testifying that he did not recall any negotiation or discussion of Section 9.02 and that "[i]t didn't mean a lot to me at the time"), 366:3-5 (Laun testifying that he did not recall discussions regarding Section 9.02), 404:4-7 (same), 476:7-16 (Zahorchak testifying to the same)), and was not changed between Alcoa's initial draft and the final Acquisition Agreement, (*compare* PX1 at ALCOA_RANK0008553, *with* Acquisition Agreement § 9.02; *see also* Tr. 403:11-14).  There also was no suggestion during the trial or in the parties' post-trial submissions that the parties specifically discussed whether, or under what circumstances, an amendment or alteration to an Assumed Liability would, or would not, result in breach of Section 9.02.

In addition to the provisions under which Rank claims indemnification rights, the Acquisition Agreement also contained an indemnification provision in favor of Alcoa. Specifically, that provision provides:

> From and after the applicable Closing, Purchaser shall cause the Transferred
> Subsidiaries to indemnify [Alcoa] and its Affiliates against and hold them
> harmless from any Loss to the extent attributable to . . . any Taxes resulting
> from a breach of any Tax-related covenant contained in this Agreement by
> [Rank] or any Affiliate of [Rank] (other than the Transferred Subsidiaries)
> or, after the applicable Closing, by any Transferred Subsidiary.

(PX6 § 13.01(b).)

**B.** ***Negotiation of the Acquisition Agreement and the Alcoa Restructure Plan***

On November 9, 2007, Rank submitted an offer to Alcoa to undertake the Acquisition for $2.7 billion. (*See* PX1.) The final purchase price did not change from Rank's initial offer, but the parties heavily negotiated the structure and nuances of the transaction through the discussions and negotiations related to the Acquisition Agreement.

In Alcoa's initial draft of the Acquisition Agreement, dated October 29, 2007, Alcoa contemplated undertaking Post-Signing Restructuring Actions. (*See id.* at ALCOA_RANK0008545.) Similarly, during the early stages of the parties' negotiation, Rank contemplated contracting away its right to object, post-signing, to Alcoa's implementation of any (or some, or none) of the Post-Signing Restructuring Actions. (*See id.* at ALCOA_RANK0008470, ALCOA_RANK0008545.) The contours, scope, and language of the provisions related to the Post-Signing Restructuring Actions changed during November and December 2007, but Alcoa's basic right to undertake a series of specific post-signing actions did not change from Alcoa's initial draft and was included in the final version of the Acquisition Agreement. (*Compare id.*, *with* PX6 § 7.03.)

Although Rank did not have the right to object to specific Post-Signing Restructuring Actions it was nevertheless involved in and aware of Alcoa's development of its plan for the Post-Signing Restructuring Actions. Furthermore, certain of the Post-Signing Restructuring Actions were, at least in part, for Rank's benefit or designed to facilitate Alcoa's efforts to accomplish at least two of the goals of the Acquisition Agreement. First, the Post-Signing Restructuring Actions allowed and created a means for Alcoa to move—and thus make available for Rank's purchase—certain assets that Rank wished to purchase that were embedded in entities

10

that the parties intended for Alcoa to retain.  (Tr. 349:1-8.)  Second, because Rank was purchasing the Transferred Subsidiaries on a "cash and debt free basis," (*id.* at 54:7-16), Rank did not want to purchase assets with substantial amounts of cash on their books, (*id.* at 52:25-53:11 (stating that cash is subject to exchange rates and can become "trapped," meaning that it is hard to remove from a country), 53:17-19 (stating that when you purchase cash, "you have money sitting in the bank earning . . . nothing and you're going to borrow money at interest to buy it[, which is] not a good deal"), 117:24-118:2).  As Cole testified, "[y]ou typically don't want to borrow money to buy cash, (*id.* at 52:10-21), and thus "[d]uring the course of the deal, in discussions with Alcoa, [he] made it clear that [Rank] didn't want a lot of cash" remaining in the subsidiaries Rank would be acquiring, (*id.* at 54:9-16).  In other words, as a general rule of the acquisition, Rank did not want to pay cash for cash, and it made this known to Alcoa in various ways.

On November 28, 2007, after the parties had exchanged early drafts of the Acquisition Agreement, Alcoa provided Rank's tax and legal advisors with a draft plan for the Post-Signing Restructuring Actions Alcoa intended to take and/or implement with regard to its intercompany arrangements in nineteen countries (the "Restructure Plan").  (PX2A; PX2; *see also* Tr. 105:20-106:25.)[13]  Getz, at that time a member of Rank's Deloitte team,[14] forwarded the draft to Cole and Dunkley of Rank.  (*See* PX2.)  Among the more than 100 contemplated Post-Signing Restructuring Actions included in the Restructure Plan was a loan from Alusud Chile to ALAHC.  (PX2A at 43.)  The draft Restructure Plan's proposal for repayment of loans from

---

[13] PX2 and PX2A contain the same draft Restructure Plan.  (*See* Tr. 59:7-18.)  Because Rank referred throughout trial to the enlarged version of the draft Restructure Plan contained in PX2A, I do so here.

[14] Both Rank and Alcoa engaged Deloitte with respect to the Acquisition; Deloitte operated two different teams who worked separately.  (Tr. 57:15-18, 181:16-18.)

Alusud Uruguay, S.A. ("Alusud Uruguay") and Aluminerie Lauralco Inc. ("ALI") to Alusud Chile, followed by a loan from Alusud Chile to ALAHC—an Alcoa British Virgin Islands-entity—thereby removing cash from Alusud Chile—and, finally, resulting in a dividend to Alcoa—thereby removing cash from ALAHC. (*Id.* at 42–43.) Alusud Uruguay and ALI were not being sold to Rank as part of the Acquisition. (*Id.*)

On November 29, 2007, Rank, Alcoa, and their respective tax advisors met in Pittsburgh, Pennsylvania to discuss the draft Restructure Plan (the "Pittsburgh Meeting"). (*See* Tr. 105:20-24, 188:8-189:10, 210:25-219:2, 355:5-12, 412:1-11, 471:16-472:3.) Negotiations regarding the Restructure Plan were a "collaborative effort," (*id.* at 212:25-219:2), with both parties seeking various concessions, (*id.* at 217:12-14; *see also, e.g.*, DX17). Rank understood that the Restructure Plan either created or identified loan positions that Rank would want to unwind after the acquisition without triggering a tax. (Tr. 218:17-220:8.)

At least as early as the Pittsburgh Meeting, both parties were aware of the possibility that the SII could recharacterize a loan from Alusud Chile to ALAHC as a taxable withdrawal of profits from Chile. In fact, a note that was included as part of the draft of the Restructure Plan circulated in connection with the Pittsburgh meeting stated that:

> Chilean Income Tax law expressly states that amounts transferred by a Chilean limited liability partnership to its foreign partners in the form of a loan will be considered a withdrawal of profits if the Chilean IRS determines that the loan is a disguised profit distribution, which would be subject to an overall tax burden of 35%.

(PX2A at 43 (Step 13).) The note further explained that "[t]here are four factors that may be relevant in determining whether the loan is granted under market conditions, which may decrease the potential for reclassification of the loan." (*Id.*) The four factors identified were: if the loan is a "documented loan," if the loan was subject to an "arm's length rate of interest," if payment

of both principal and interest is "effective[] and timely," and if "the loan is not to the direct parent."  (*Id.*)  It was also noted that Alcoa should consider having Alusud Chile loan cash to a Hungarian subsidiary of Alcoa as a way to "avoid loaning to [Alusud Chile's] parent," ALAHC.[15]  (*Id.*)

Underlying the parties' discussions during the Pittsburgh Meeting was the acknowledgement that the Acquisition Agreement would grant Alcoa the right, but not the obligation, to undertake any of the proposed transactions.  As Getz testified, Thomas Weglewski, Alcoa's tax counsel, "explained that what they wanted to do [in providing the draft Restructure Plan and at the Pittsburgh Meeting] was give us an understanding of the structure overall so that we could make our plans."  (Tr. 188:25-189:4.)  The discussion during the Pittsburgh Meeting was "at a high level" because the document was "evolving," (*id.* at 188:25-189:12), and because the parties understood that the Restructure Plan was Alcoa's responsibility, (*id.* at 193:6-9). Alcoa was not asking for approval of the Restructure Plan, but Alcoa was willing to discuss with Rank "if the structure didn't work for Rank".  (*Id.* at 189:5-10; *see also id.* at 337:22-338:5 (Laun testifying that Rank did not have right of approval but "[w]e were sharing [the Restructure Plan] to give them . . . information . . ., and we expected that if Rank had questions, they would revert").)

While the record is not clear regarding whether Alcoa and Rank specifically discussed the Alusud Chile-ALAHC loan at the Pittsburgh Meeting, (*see id.* at 190:12-18, 472:5-8), the parties continued to communicate regarding the Restructure Plan following the Pittsburgh Meeting, (*id.* at 190:19-191:9).

---

[15] There is insufficient evidence in the record to support a finding as to why Alcoa did not undertake the alternative to loan cash to the Hungarian subsidiary or whether Rank was involved in that decision.  (*See* Rank Mem. at 19 n.7; Alcoa Mem. at 40.)

One issue the parties discussed during and after the Pittsburgh Meeting was the potential tax consequences of the Restructure Plan and how to address those potential consequences. (*Id.* at 190:5-8; *see also* DX14; DX17.) These discussions included, among others, Rank's request to change the structure of the Post-Signing Restructuring Actions in certain jurisdictions because Rank was concerned about adverse consequences post-closing. (Tr. 190:21-191:9.) For example, the parties addressed issues with respect to the Restructure Plan's treatment of assets in Mexico, (PX14; PX17; Tr. 63:16-25, 186:25-187:19), and Hungary, (PX14; PX17). The Acquisition Agreement ultimately included a specific tax indemnification provision regarding Mexico. (PX6 § 13.01(a)(xii) ("Taxes arising from the purchase and sale hereunder of a 5% interest in Grupo Alcoa, S. de R.L. de C.V. and any Taxes arising from the Mexican 338 Elections.").)

Alcoa and Rank understood prior to signing the Acquisition Agreement that the 2008 Loan would result in a deferred tax liability on Rank's books following closing. (*See* Tr. 472:2-8 (Zahorchak testifying that the parties "general[ly] acknowledge[ed] that the plan we were putting forth with BVI accomplished the goal of cash extraction, but . . . was moving the issue of the profit distribution tax down the road"), 191:20-192:5 (Getz testifying that Deloitte provided to Rank its observation that the 2008 Loan would leave a deferred tax liability on the books for Rank to address post-Closing), 193:17-196:5; *see also* DX10 (email from Getz to Cole explaining that "Chile has lent $31m to BVI, its parent. If Chile paid a dividend we understand a 35% withholding tax would be due. So, while there is no immediate trapped cash, there is approximately a $10m deferred tax liability").)

Although Rank and Alcoa were aware of the deferred tax liability, they did not discuss the other potential adverse consequences of the Chile loan. Getz testified that he did not recall

that the 2008 Loan between Alusud Chile and ALAHC was part of their discussions, (Tr. 191:7-9), and explained that in providing observations regarding the potential tax liability, he was not considering the risk of recharacterization, (*id.* at 195:9-196:5). Indeed, while Getz was not providing advice regarding the Acquisition Agreement itself (and had not seen it), Getz testified that he understood the possibility of recharacterization to be Alcoa's concern. (*Id.* at 204:25-206:8.) Similarly, Cole explained that he viewed any possible tax arising from the treatment of the loan as dividend as something that would be Alcoa's responsibility should it arise. (*Id.* at 72:13-73:19; *see also id.* at 149:9-19 (stating that post-signing, no one from Rank asked questions about or requested changes to the terms of the 2008 Loan).) Zahorchak testified that he could not recall any instances of Rank requesting that Alcoa not extract cash from Chile using a loan. (*Id.* at 472:12-19.) Individuals from Alcoa also testified that Rank did not ask questions or offer comments about the 2008 Loan. (*Id.* at 149:9-19, 338:6-10; PX54 at 113:23-114:19.)[16]

Based on the foregoing, I find the following: (1) Alcoa and Rank understood that certain of the Post-Signing Restructuring Actions were necessary to permit Alcoa to move—and thus make available for Rank's purchase—certain assets that Rank wished to purchase that were embedded in entities that the parties intended for Alcoa to retain; (2) Rank wanted to purchase the Transferred Subsidiaries as part of the Acquisition on a cash and debt free basis, because Rank did not want to purchase assets with substantial amounts of cash on their books; (3) Rank contemplated that if it agreed to the Acquisition it would be acquiring the Alusud-ALAHC loan; (4) the loan would be between two entities that, post-Closing, Rank would control; (5) Rank could have, but did not, attempt to negotiate for greater protections regarding the extraction of

---

[16] PX54 contains the parties' designations from the deposition of Marcelo Nascimbem that were submitted in lieu of live testimony.

cash from Chile; (6) Rank knew it would be acquiring a deferred tax liability in the amount of $10 million; and (7) Rank knew that there was the potential for an adverse tax consequence if the loan contemplated in the Restructure Plan was not repaid.

### C. *Alcoa and Rank Sign the Acquisition Agreement*

The parties signed the Acquisition Agreement on December 21, 2007. (Jt. Fact Stip. ¶ 3.) Attached to the Acquisition Agreement is a Seller Disclosure Letter, which includes a copy of the Restructure Plan as it existed at the time of signing. (*Id.* ¶ 7; PX6 at ALCOA_RANK0013806-92.) This draft of the Restructure Plan—like the draft circulated in connection with the Pittsburgh Meeting—included as one of the Post-Signing Restructuring Actions the loan from Alusud Chile to ALAHC. (*See* PX6 at ALCOA_RANK00013849-52.) The Acquisition Agreement required the parties to "cooperate in good faith in respect of any Post-Signing Restructuring Action." (*Id.* § 7.03(b).)

Throughout the negotiation of the Acquisition Agreement up to and including the days immediately before signing, Rank expressed concern about the amount of cash Alcoa would be leaving in the acquired businesses. In fact, on December 19, 2007, two days prior to signing the Acquisition Agreement, Cole explained to Getz that "it is the nature of these businesses" that you cannot remove all the cash, but the $26 million in trapped cash Alcoa intended to leave in the Transferred Subsidiaries at that time was "an issue." (DX10; *see* Tr. 54:9-16, 111:23-112:12.) As a result, Rank negotiated for a $10 million cap on the amount of cash that Rank would pay for without a dollar for dollar reduction in the purchase price. (Tr. 54:9-16, 83:16-84:9, 115:4-17; PX6 § 7.03(b).) The practical result was that, while Alcoa was not required to take all (or any) of the Post-Signing Restructuring Actions, Alcoa was heavily incentivized to do so by the negotiated terms of the Acquisition Agreement. (*See* Tr. 54:17-24 ("There is no particular magic

about $10 million . . . [b]ut that means that Alcoa was strongly incentivized to ensure that there was not more than $10 million left in the business, because I wouldn't pay them for it."), 353:15-354:12 ("Alcoa did not have a legal obligation under 7.03(a) to implement the [Post-Signing Restructuring Actions but was] commercially incentivized to do so . . . .  We wanted to do as many of [the steps] as we possibly could in order to extract the cash so that we would get down at or below the $10 million threshold."); *see also* PX3 (Cole explaining to Irene Schmidt that because of problems like "sticky cash" or trapped cash, "the main point is the road map should not be seen as a set of optional steps but an integral part of the transaction.  We can always engage post signing if you decide you don't want to do particular things or a problem emerges but, once we accept the plan, it shouldn't be viewed as a set of options.").)  Indeed without Rank's insistence on a $10 million cap as part of the Acquisition Agreement, Alcoa would not have had as much reason to extract cash from the Transferred Subsidiaries.  Instead, Alcoa would have preferred in at least some cases to "just leave the cash behind and be paid for it." (Tr. 352:9-17; *see also id.* at 117:11-14.)  Ultimately, prior to Closing, Alcoa did in fact succeed in reducing the amount of cash to below $10 million.  (*Id.* at 87:8-18.)

### D.     *The 2008 Loan and the Closing of the Acquisition*

Discussions concerning the Restructure Plan and the Post-Signing Restructuring Actions, including the 2008 Loan, continued after the Acquisition Agreement was signed.

### 1.  Extracting Cash From Chile

In January 2008, the Chilean office of the law firm of Baker McKenzie ("Baker")[17] sent representatives of Alcoa in Latin America two memoranda providing advice on the tax effects of

---

[17] Prior to December 2016 Baker McKenzie was known as Baker & McKenzie.  Aebra Coe, *Why BigLaw Is Kicking Surnames & Ampersands To The Curb*, LAW360 (Jan. 5, 2017, 5:07 PM), https://www.law360.com/articles/877285/why-biglaw-is-kicking-surnames-ampersands-to-the-curb.

extracting cash from Chile (the "Baker Memos"). (PX8; PX9.)[18] Baker did not participate in the negotiation or drafting of the Acquisition Agreement, nor did Baker participate in drafting the Restructure Plan. (*See* Tr. 478:7-11, 484:14-21.) Nothing in the Baker Memos suggests that Baker was aware of, or considered, Rank's obligations with respect to the 2008 Loan as set forth in the Acquisition Agreement. Zahorchak testified that he was "surprised" to receive the Baker Memos because Alcoa "had not asked for them and . . . [already] had a plan established." (*Id.* at 478:14-21; *see also id.* at 478:2-6; PX54 at 110:10-111:14.)

The first memorandum, dated January 18, 2008 (the "January 18 Memorandum"), explained that "the simplest way" of transferring funds out of Chile would be to make a distribution or withdrawal of earnings by ALAHC from Alusud Chile, and such a withdrawal would result in a tax of up to 35%. (PX8 (Trans.) at 1.) Baker's advice confirmed what Alcoa (and Rank) already knew: that extracting cash by declaring a dividend would trigger an immediate tax consequence. There is no evidence in the record suggesting that Rank proposed that Alcoa declare a dividend and pay the tax up-front.

In the January 18 Memorandum Baker also noted that a cash loan from Alusud Chile to ALAHC was "legally feasible," but acknowledged that there was a risk that the loan would be recharacterized as a hidden distribution of profits under Article 21 of the Chilean Income Tax Law ("Article 21"). (*Id.* at 2.) Baker identified two factors it felt would increase the risk of recharacterization—(1) a high loan amount and (2) Alusud Chile's history of making loans abroad—and two factors that would decrease the risk of recharacterization—(1) formally documenting the loan, including paying the stamp tax and setting market conditions for the

---

[18] The Baker Memos were translated for purposes of this litigation from the original Spanish. "Trans." refers to the translated portions of a trial exhibit.

operation of the loan, and (2) setting a short term and making periodic payments of interest and capital. (*Id.* at 3.) With regard to the length of the term and periodic payments, Baker emphasized that "long terms and a lack of periodic payment would go against" the argument that the SII should not recharacterize the loan. (*Id.*) Baker also pointed out that the SII had already reviewed Alusud Chile's foreign loans with an eye to recharacterization, but those loans did not involve a subsidiary-parent relationship so the SII ultimately focused on stamp tax issues instead. (*Id.*) Baker recommended against a subsidiary-parent loan because of the risk of recharacterization, and noted that an intercompany loan to an entity other than Alusud Chile's parent would "v[e]ry significantly decrease the tax risks". (*Id.* at 4.) After reviewing this advice, Doria, who was a member of the Alcoa Latin American team, acknowledged that he "now" understood the recharacterization risk associated with an Alusud Chile-ALAHC loan. (*Id.* at RANK0003053-54.)

Although not identical, the factors Baker identified in the January 18 Memorandum are similar to the factors identified by Deloitte in the draft Restructure Plan provided on November 28, 2007 in advance of the Pittsburgh meeting. (*See* PX2A at 43 (Step 13).) In particular, Baker and Deloitte both identified as significant steps to reduce the risk of recharacterization: (1) documenting the loan, including paying the stamp tax; (2) setting market-based conditions; and (3) timely repayment of the interest and principal. (*Compare id.*, *with* PX8 (Trans.) at 3.)

The second of the Baker Memos, dated January 29, 2008 (the "January 29 Memorandum"), reiterated Baker's advice that a loan from Alusud Chile to ALAHC was legal but carried a tax risk, and explained four options—undertaking the 2008 Loan, declaring a dividend, undertaking a loan with a Peruvian entity, and assigning credit from Alusud Chile to ALAHC—for extracting cash from Chile. (PX9 at RANK000128.) Baker also explained in the

January 29 Memorandum that the SII had not published clear guidelines on recharacterization, but noted that Alusud Chile's history of similar loans "does not help." (*Id.*) Baker explained:

> This, added to the fact that [Alusud Chile] is being sold jointly with [ALAHC], and that the sale is being made on a cash-free basis, allows us to understand that a prompt repayment of this loan by the new owners of [Alusud Chile] seems unlikely, a fact that would increase the tax risk of this operation.

(*Id.*) Although there was some internal discussion regarding the options presented by Baker, Baker's analysis did not affect Alcoa's plans regarding the 2008 Loan. (*See, e.g.*, Tr. 482:5-8 ("The factors noted and the issues at risk were similar to what Deloitte had described to us. At this point we had an agreed upon plan with Rank, and there was nothing new here that would cause a re-thinking.").) Doria testified that after receiving the Baker Memos he saw "no risk at all" or, at most, "minimal, minimal risk" of recharacterization because if the profits were put back under the terms of the loan, it would not be a "permanent distribution of profits" and thus "the tax authorities couldn't claim that a distribution of dividend was made because the cash had returned to the subsidiary." (*Id.* at 557:6-17.) While there is no evidence suggesting that Alcoa provided either of the Baker Memos to anyone at Rank prior to Closing, Alcoa not doing so is consistent with Zahorchak's view that the analysis regarding the 2008 Loan was unchanged following receipt of the Baker Memos. (*Id.* at 481:11-482:11, 485:8-14.)

On February 6, 2008, Nascimbem informed Baker in Chile that the United States Alcoa team had decided to move forward with the 2008 Loan—i.e., an intercompany loan between Alusud Chile and ALAHC. (PX12 at RANK0021808.) Nascimbem explained they "certainly know all the risks" related to recharacterization. (*Id.*; *see also* Tr. 487:13-488:10.)

### 2. The Acquisition Closes

Alcoa did not formally document the 2008 Loan prior to Closing. (Jt. Fact Stip. ¶ 9; *see*

*also* PX54 at 53:18-54:5.)  Prior to Closing, however, Nascimbem drafted an agreement for the 2008 Loan with input from Doria and Baker.  (*See* PX54 at 44:22-45:14; Tr. 565:7-10.)

Alcoa informed Rank of the terms of the 2008 Loan in the weeks leading up to Closing. Specifically, in emails on February 11 and February 12, Laun and Weglewski forwarded a draft of the agreement for the 2008 Loan to Rank and its tax and legal advisors.  (PX37 at RANK0000001-02.)  Alcoa's draft included, among other things, an interest rate of LIBOR plus .25%, a one-year term with a maturity date of January 28, 2009, and a provision barring renewal "in any event."  (*Id.* at RANK0000018.)  Alcoa's draft also provided that no amendments would be effective unless made by the parties in a signed writing.  (*Id.* at RANK0000021.)

Doria, who was responsible for the decision to include at least some of the agreement's terms, (Tr. 565:7-10), believed that the short term, the specific maturity date, and the market interest rate were important terms and should be properly documented, (*id.* at 565:19-22, 597:2-598:2).  Doria explained that his decision to include these terms was based on a combination of Baker's and Deloitte's advice, as well as his experience in the region.  (*Id.* at 597:16-598:2; *see also id.* at 607:7-10.)  Doria selected a one-year term despite it not being specifically recommended by Baker—who advised "a short term," (PX8 (Trans.) at 3)—or Deloitte—who simply advised that principal and interest should be "effectively and timely paid," (PX2A at 43). Doria explained his reasoning for selecting one-year as follows:

> [Rank] knew that we would make a loan from Alusud Chile to the parent company ALAHC for a short term.  It seemed to me that one year was a reasonable time to put in the agreement so that Rank . . . would have one year to put cash into Alusud Chile or into ALAHC to repay the loan with Alusud Chile and deploy that cash to other entities within the system.

(Tr. 578:17-23.)  In other words, the one-year term was included to be "short"—consistent with the advice that had been received—and practical—consistent with allowing Rank time to

repay.[19]

Although Alcoa informed Rank of the contemplated terms of the 2008 Loan and asked whether the terms were "acceptable" to Rank, (PX37 at RANK0000001), both parties understood that under the Acquisition Agreement Rank did not have a right to approve or request modification of the terms of the loan, (PX10 at ALCOA_RANK0029030, ALCOA_RANK0029035; PX12 at RANK0021805; PX54 at 91:4-17; Tr. 338:2-5; *see also* PX6 § 7.03 (stating that Alcoa has the right to perform the Post-Signing Restructuring Actions)). Rank received a copy of the draft loan agreement, but the parties did not discuss the terms of the 2008 Loan prior to Closing. (*See* Tr. 149:14-19, 337:22-338:25, 429:5-430:8, 610:9-19.)

The relevant portions of the Acquisition closed on February 29, 2008. (Jt. Fact Stip. ¶¶ 3, 6.) At the time of Closing, Alcoa had accomplished the 2008 Loan by causing ALAHC to assume Alusud Uruguay's and ALI's obligations to Alusud Chile in the amount of $31,407,384 and causing Alusud Chile to transfer $3,002,166 to ALAHC. (*Id.* ¶ 10.) Alcoa accomplished these steps without formal documentation. ALAHC then, as part of Closing, issued a dividend to Alcoa for the total amount of the 2008 Loan—$34,409,550.52. (Tr. 394:25-395:5, 83:7-10.) Although the mechanism for the 2008 Loan differed in some respects from that described in the Restructure Plan appended to the Acquisition Agreement at the time of signing, the 2008 Loan resulted in what had been contemplated in the Restructure Plan: Alusud Chile made an intercompany loan to ALAHC, which was transferred to Rank as a holding company, with no cash and no source of income. (*Id.* at 82:19-23, 508:14-21.)

---

[19] The terms Doria selected for the 2008 Loan were consistent with what individuals at Alcoa termed "template" or "example loans". (PX37 at RANK0000004; *see also id.* at RANK0000011-12 (Alusud Argentina-ALAHC draft loan containing interest rate of no less than LIBOR plus .25% and a one-year term); *id.* at RANK0000024 (Alusud Peru-ALAHC draft loan containing same terms).)

### 3.  The 2008 Loan Document

On June 25, 2008, Borja emailed Doria requesting a signed copy of the 2008 Loan. (DX102.)  He explained Rank had an unsigned copy of the loan, but that Rank needed a signed copy to present to the Chilean authorities.  (*Id.*)  In late July or early August, Alcoa executed the signed 2008 Loan, dating it as of January 29, 2008 and specifying a January 28, 2009 maturity date (the "Loan Agreement").  (Jt. Fact Stip. ¶ 9; PX43.)  Consistent with the draft agreement Alcoa sent Rank prior to Closing, the executed Loan Agreement specified an interest rate of LIBOR plus .25%, a one-year term with a maturity date of January 28, 2009, a provision barring renewal "in any event," and a provision barring amendment except for in a signed writing. (*Compare* PX37 at RANK0000018, RANK0000021, *with* PX43 at RANK0000378-80.)

The fact that the Loan Agreement was not signed until approximately six months after the Closing Date did not affect Rank's view of or treatment of the loan.[20]  (*See* Tr. 153:7-12.) Moreover, Rank's post-Closing actions are consistent with Rank's understanding of the existence and terms of the 2008 Loan.[21]  At some point after Closing, Rank did the following:  accounted for the loan on its Chilean books as a loan, (*id.* at 131:8-10 ("We absolutely from day one we accounted in our Chilean books we accounted for it as a loan.")); recorded the deferred tax liability on its books, (*id.* at 138:21-139:3); recorded the periodic interest payments due from ALAHC on the 2008 Loan as a receivable on Alusud Chile's balance sheet, (Jt. Fact Stip. ¶ 13); and paid the stamp tax on the loan, registering the loan as a debt instrument with the Chilean

---

[20] In failing to formally document the 2008 Loan for approximately six months Alcoa did not strictly adhere to the advice from Deloitte and Baker that formal documentation would reduce the risk of recharacterization.  (PX2A at 43; PX8 (Trans.) at 3.)  However, there is no evidence that delaying the formal documentation of the 2008 loan was a factor in the SII's later recharacterization.  (*See infra* Part 3.D.)

[21] Upon Closing Alcoa's employees at Alusud Chile became employees of Rank, thus transferring to Rank their knowledge of the 2008 Loan.  (Tr. 235:7-13, 631:14-18.)

Central Bank, (Tr. 131:11-132:1; Jt. Fact Stip. ¶ 11).[22]

### 4. Rank's Assessment and Treatment of the 2008 Loan

Rank viewed the 2008 Loan as inefficient for at least three reasons. First, Alusud Chile had to include interest on the loan as taxable income, but for commercial reasons had no need for additional cash. (Tr. 72:13-73:2; *see also id.* at 163:7-16 (Cole testifying that Rank wanted to get the 2008 Loan off of its books), 199:24-200:15 (Getz explaining that the 2008 loan to ALAHC created negative tax arbitrage).) Second, ALAHC had no cash and no taxable income against which interest could be deducted or offset. (*Id.* at 82:5-83:10.) Third, Alusud Chile also experienced unpredictable gains or losses depending on fluctuations in the currency exchange rates. (*Id.* at 82:14-18, 240:17-241:2.)

Because of these inefficiencies, once Rank assumed the 2008 Loan, as well as similar loans involving entities in four or five other jurisdictions, Rank and its advisors considered various strategies for eliminating these loans. (*See id.* at 200:16-21.) Rank understood that these loans, including the 2008 Loan, could have tax consequences, and Rank's goal was to find a way to "unwind" the loans without triggering a tax. (*Id.* at 220:1-8.)

Of the various options Rank considered for eliminating the 2008 Loan, repayment was "never seriously an option." (*Id.* at 157:3-6; *see also id.* at 156:17-157:6, 158:4-8, 169:4-13.) Indeed, Rank never intended to repay the 2008 Loan. (*See id.* at 140:3-6.) Rank did not believe it made sense from a tax or commercial perspective for it to repay the 2008 Loan, because although Rank had the cash to repay the loan and could have put cash in one subsidiary, ALAHC, to move it to another subsidiary, Alusud Chile, it did not want to provide cash to

---

[22] Because the stamp tax was incurred pre-Closing—and Alcoa did not invoke an exception to its indemnification obligation—Alcoa agreed to and did reimburse Rank for the amount of the stamp tax. (Tr. 132:2-5; Jt. Fact Stip. ¶ 11.)

ALAHC for repayment because Rank did not need to put $34 million into Alusud Chile. (*Id.* at 81:3-7.) Thus, if Rank had repaid the loan, Rank would have been left with an undesirable commercial position—cash in Chile—and an undesirable tax position—a future tax obligation if it withdrew that cash from Chile. Cole explained that this result was doubly undesirable because if Rank repaid the loan and was taxed, Rank would incur a tax that was "[w]ithout a doubt . . . shift[ed] . . . to my watch." (*Id.* at 95:14-17.) However, Cole conceded that he did not know if anyone from Rank ever asked the SII what their view would be if the 2008 Loan was repaid. (*Id.* at 95:18-23.)

Like with the other loans involving Latin American entities, Rank knew, at the time of Closing, that the 2008 Loan could result in negative tax consequences. Unlike with the other loans, however, Rank was not able to find what it considered to be a commercially viable way to unwind the 2008 Loan without triggering an immediate tax. (*Id.* at 200:22-201:17, 203:6-9.) Faced with no commercially viable alternative and not wanting to repay the loan, Rank decided to leave the 2008 Loan in place. (*See id* at 256:1-16 (stating that Borja raised the possibility of declaring the 2008 Loan a dividend with individuals at Rank in July of 2008 and again a year later, but did not receive a response).)

### 5. Rank Amends the 2008 Loan

The 2008 Loan reached maturity on January 28, 2009, but was not paid or otherwise eliminated. In or around May 2010, with the loan still outstanding, Rank caused ALAHC and Alusud Chile, both its subsidiaries, to execute an amendment to the Loan Agreement (the "Loan Amendment").[23] (Jt. Fact Stip. ¶ 14; PX44.) The Loan Amendment, which was dated as of

---

[23] Borja testified that he executed the amendment to the 2008 Loan shortly after the SII selected Alusud Chile for an audit, (Tr. 284:9-17), but the record is not clear as to when, precisely, the Loan Amendment was put into place—before or after Alusud Chile was officially notified of the audit.

January 29, 2009, (Jt. Fact Stip. ¶ 14; PX44), modified the terms of the original Loan Agreement by: (1) increasing the interest rate to 4.4375% per annum; (2) increasing the term of the loan to four years, with a maturity date of January 28, 2012; and (3) deleting the provision barring renewal. (PX44.)

### E.     *The SII Audit*

In 2010, Alusud Chile requested a tax refund for calendar year 2009—corresponding to tax year 2010—for losses related to the 2008 Loan. (DX116 at 21, ¶ 13; *see also* Tr. 257:21-258:15, 283:19-284:8, 298:7-12.) The 2008 Loan was denominated in United States dollars, and the tax losses arose from fluctuations in the associated foreign exchange rate between United States and Chilean currencies. (*Id.* at 258:13-15, 283:25-284:8, 298:7-12.)

On September 27, 2010, the SII issued a formal notice that it had initiated a tax audit of Alusud Chile (the "Audit"). (PX15.) The Audit was for Chilean tax year 2010 (calendar year 2009) and focused on Alusud Chile's activities for calendar years 2008 and 2009. (*See id.*) The refund request triggered the Audit. (Tr. 257:21-258:15.)

In response to the letter rogatory request issued in connection with this litigation, the SII was asked why it undertook the Audit, and the SII's representative stated that it selected Alusud Chile for an audit "along with many other taxpayers . . . under a routine inspection program related to [Alusud Chile] . . . asking for return of an interim payment for absorbed/lost profits." (DX116 at 21, ¶ 13.) The SII representative further clarified that the Audit was "carried out because [Alusud Chile] ask[ed] for a provisional return." (*Id.* at 22, ¶ 15.)

On October 29, 2010, Rank notified Alcoa of the Audit and explained that it related to calendar years 2008 and 2009. (PX16.) Rank requested that Alcoa "confirm" that it would be assuming control of the defense of the audit "to the extent [it] relates to [the] Pre-Closing Date

Tax Period."[24]  (*Id.*)  Alcoa did not assume control of the Audit.  Instead, during the final months of 2010, representatives of Alusud Chile discussed the progress of the audit with the SII without representatives of Alcoa present.  (*See, e.g.*, PX17; PX21.)  During that time, individuals at Alusud Chile and Rank understood the SII's interest in the 2008 Loan related to whether the loan was in fact a bona fide loan or a profit distribution that should be taxed.  (*See* PX17 at RANK_0018626.01 (Borja explaining that the SII's opinion was that the 2008 Loan was an extraction of profits on which no taxes had yet been paid); *see also* PX21 at RANK0019562, RANK0019566.)  Borja testified that during a December 13, 2010 meeting between himself, Loreto Miranda, Alusud Chile's controller, and the SII Audit manager, the SII manager explained that he had looked at the history of Alusud Chile and the fact that the 2008 Loan involved a switch of debtor to Alusud Chile's parent company, and believed that the purpose of the 2008 Loan was to extract profits.  (Tr. 265:11-23.)  Borja sent a summary of that meeting to Doria, Alcoa's tax director for Latin America.  (PX21 at RANK0019562.)

Representatives of Alcoa did not attend the initial meetings with the SII despite Rank's invitation, (*id.* at RANK0019563), and despite Zahorchak's desire to have Doria "involved in the audit and defense," (PX17 at RANK_0018631.01), but Alcoa did engage Alvaro Mecklenburg, a tax advisor at Deloitte in Chile, to assist with the audit, (Tr. 525:10-17).   Mecklenburg attended a meeting with the SII on December 28, 2010, (*id.* at 525:10-17; PX19 (Trans.) at RANK18704.01), along with Miranda, after which Miranda reported that the SII had indicated that it planned to recharacterize the 2008 Loan as a profit withdrawal, (PX19 (Trans.) at RANK18704.01).

---

[24] Rank's request for Alcoa to lead the defense was based on Alcoa's contractual obligation to "at its own expense, assume control of the defense of" "any claim, or the commencement of any audit, suit, action or proceeding . . . in respect of which indemnity may be sought."  (PX6 §§ 13.07(a)-(b); *see also* PX16.)

On January 29, 2011, as a result of an earlier telephone conversation, Baker sent an email to Rank outlining a legal argument Rank could consider as a defense in connection with the Audit. (PX24.) This argument relied on the fact that only $3 million of the approximately $34 million 2008 Loan was disbursed in 2008, and the remaining $31 million was disbursed in years prior. (*Id.* at RANK_0000604.01.) Baker believed that Rank may be able to argue that because the applicable statute of limitations was three years all but $3 million would be outside of the SII's recharacterization powers. (*Id.* at RANK_0000603.01-604.01.) In the same email, however, Baker advised that if the SII went after the whole amount Rank should not pursue this argument in litigation because of the substantial risks associated with not reaching an agreement with the SII. (*Id.* at RANK_0000604.01.) Rank did not make this argument to the SII. (Tr. 589:17-592:3.)

On January 29, 2011, Alcoa formally rejected Rank's indemnity claim.[25] (*See* PX25.) Alcoa explained that while it was "prepared to cooperate with Rank and Alusud Chile in the joint engagement of Baker & McKenzie Chile to assist" with the Audit, Alcoa "believe[d] that the unauthorized post-closing amendment of the Loan Agreement" made indemnification by Alcoa "inappropriate" under Section 9.02 of the Acquisition Agreement. (*Id.* at RANK0000375.) On February 2, 2011, Rank responded to Alcoa's letter. (PX26.) Rank reiterated that it disagreed with Alcoa's conclusion, confirmed that it would be assuming control of the Audit, and stated that "[g]iven the present dispute" a joint engagement of Baker was not "possible or appropriate." (*Id.* at RANK0000469.)

At that point, Rank adopted a strategy whereby it would attempt to resolve the Audit

---

[25] Alcoa's letter was dated January 28, 2011, but was sent to Rank by email on the morning of January 29, 2011. (*See* PX25 at RANK0000375.)

prior to litigation with the SII.  (Tr. 93:10-94:6.)  In doing so, Rank hoped that it would be able

to avoid the substantial costs associated with litigation and to reduce penalties.  (*Id.*; *see also*

PX27 at ALCOA_RANK0014105.)   However, to the extent that Rank suggests that the decision

to resolve the Audit prior to litigation meant that it could not raise factual and legal defenses as

part of the negotiations with the SII, there is no support for that position in the record.  There is

no dispute that Rank engaged in a negotiation process with the SII since Rank negotiated a

settlement with the SII whereby interest and penalties would be reduced by 93%.  Therefore,

Rank could have raised factual and legal defenses as part of the negotiations with the SII.

Rank's defense of the audit did not focus on putting forth evidence that would have

supported finding that the 2008 Loan was a bona fide loan or that the amounts being sought were

legally improper.  With regard to supporting the legitimacy of the loan, since Rank did not

contemplate repayment of the 2008 Loan, (*see* Tr. 140:4-6 (Cole testifying that "[a]s a general

statement, we had no intention of repaying"), 156:22-157:6 ("[I]n the end of the day . . .

[repayment] was never seriously an option.")), it could not have effectively argued that it

intended to pay the loan regardless of the terms of the loan.  Indeed, I find no evidence in the

record that Rank attempted to defend the 2008 Loan or dispute the amount of the loan that

should legally be subject to recharacterization.

Moreover, there is no evidence that the SII was aware of the Loan Amendment.  (*See*

DX116 at 22, ¶¶ 19–20; *see also* Tr. 98:5-7, 160:10-13, 306:15-18, 715:2-4.)  In fact, the

evidence in the record supports the conclusion that the SII was not provided with a copy of the

Loan Amendment.  (*See* DX116 at 22, ¶¶ 19–20; *see also* Tr. 98:5-7, 160:10-13, 306:15-18,

715:2-4; PX15.)  The SII expressly denied receiving a copy of the Loan Amendment, and it is

reasonable to expect that the SII would have mentioned the Loan Amendment at some point in

the course of the Audit. Rank did not provide any evidence—other than the speculative testimony of Borja, (Tr. 304:14-17 (Borja responding "no" to the question whether he could "think of any explanation why Alusud Chile would not give the Chilean IRS a copy of the document that showed the loan was still formally documented as a loan"))—that it had either provided a copy of the Loan Amendment, or otherwise disclosed its substance, to the SII. Therefore, it is more probable than not that Rank did not provide the Loan Amendment—Rank's evidence that the loan was not past maturity—to the SII. This conclusion also makes logical sense since Rank had no intention of repaying the 2008 Loan; therefore, providing a copy of the Loan Amendment would have provoked a discussion concerning Rank's intention to repay the loan, and Rank would have had to admit to the SII—to the extent it had not already done so in its meetings with the SII—that it was not going to repay the 2008 Loan regardless of the loan terms. On the record before me, I find Rank's arguments that it sent the Loan Amendment to the SII not supported by the record and unpersuasive.[26]

By early April 2011, Rank had negotiated a settlement with the SII whereby interest and penalties would be reduced by 93%. (*See* PX45 (describing, by April 5, 2011, negotiation of waiver of 93% of interest and penalties); PX32 (Trans.) at RANK0001002-07.) On April 29, 2011, Rank, on behalf of Alusud Chile and ALAHC, paid $10,139,882.24[27] in taxes, fines, and

---

[26] Specifically, Rank argues: (1) that it did not have an opportunity to challenge the SII's statement that it had not received a document labeled "loan amendment," (2) that it did not have an opportunity to refresh the recollection of the SII official who responded to the letter rogatory with the Loan Amendment or ask her to review the audit file, and (3) Borja, the former Latin American Regional Finance Controller for Rank, testified that he could not think of any reason that Alusud Chile would not have given the SII a copy of the Loan Amendment to demonstrate that the 2008 Loan was still formally documented. (Rank Mem. at 29.) These arguments lack merit, and, in addition to the reasons cited above, there is contemporaneous evidence in the record that the SII did not receive the Loan Amendment. In its Notice Letter of Review Completion, dated August 12, 2011, (the "Final Notice"), the SII identified the loan terms contained in the Loan Agreement not the Loan Amendment; this is further proof that the SII was not given the Loan Amendment. (PX32 (Trans.) at RANK0001007-08 ("[U]nder the contract called 'Loan Agreement', dated January 29, 2008, executed with ALAHC, establishing a single loan in the amount of US $34,409,550.52 with an interest rate of LIBOR plus 0.25%, and within one year for payment.").)

[27] The Chilean Tax was assessed in Chilean pesos, (PX32 (Trans.) at RANK00010112), but the parties agree on the

interest.  (Jt. Fact Stip. ¶ 16; PX32 (Trans.) at RANK0001012; PX36.)

In its Final Notice the SII informed Alusud Chile that the audit, the purpose of which was to "validate transactions related to loans made by [Alusud Chile] to related companies domiciled in a foreign country," had concluded.  (PX32 (Trans.) at RANK0001007.)  The SII concluded that the precursor loans to the 2008 Loan, which were originally granted to Alusud Uruguay and ALI were transferred to ALAHC, "producing a change of debtor . . . [and] establishing a single loan in the amount of US $34,409,550.52 with an interest rate of LIBOR plus 0.25%, and within one year of payment."  (*Id.*)  Based on the information provided during the Audit, the SII found that the loans were, "in fact, withdrawals and therefore should be subject to the Additional Withholding Tax" provided for under Article 21 of the Income Tax Law.  (*Id.*)  The SII described the following "reasons" for its decision:

- From the date of incorporation, that is, since 1991, Alusud Chile has accumulated profits in the Taxable Profit Ledger (hereinafter "FUT"), profits that the partners have never withdrawn.

- In commercial year 2008, Alusud Chile taxpayer, a Legal entity other than a corporation granted a loan to its head office ALAHC, through the direct delivery of remittances for US $3,002,166, and indirectly, through Alusud Uruguay and Alusud Ali, Inc., the amount of US $31,407,384.

- On January 29, 2008, Alusud Chile and ALAHC entered into an agreement called "Loan Agreement", in which is evidenced the loan granted by Alusud Chile to its head office ALAHC for a total amount of US $34,409,550.52, with a rate of LIBOR plus 0.25%.

(*Id.* at RANK0001007-08.)  The SII's Final Notice provides the basic facts underlying its decision to recharacterize the 2008 Loan, but does not provide a detailed analysis as to what factors were or were not relevant to its determination.  In particular, the SII's Final Notice did

---

amount in dispute in United States currency, (*see* Jt. Fact Stip. ¶ 16).

not discuss lack of repayment of the 2008 Loan or the existence or effect, if any, of the Loan Amendment.  (*See generally id.*)

Rank never repaid the 2008 Loan.  After the recharacterization of the 2008 Loan as a hidden distribution of profits by the SII and Rank's payment of the Chilean Tax, Alusud Chile and ALAHC entered into an "Agreement to Render No Effect" to the Loan Agreement. (DX125.)  The Agreement to Render No Effect referenced the Loan Agreement but did not refer to the Loan Amendment.  (*Id.*)  In doing so, they agreed to treat the 2008 Loan as a distribution of profits as of the date of recharacterization and thus eliminated the loan from both Alusud Chile's and ALAHC's books.  (*Id.*; *see also* Tr. 153:13-155:20.)

## F. *Alcoa Refuses Rank's Request for Indemnification*

After the SII issued its Final Notice, Alcoa continued to refuse Rank's request for indemnification related to recharacterization of the 2008 Loan.  On November 5, 2011, Laun informed Cole that Alcoa's basic position had not changed stating that "this liability got triggered post-closing as a result of the local folks removing the one-year limitation that was contained in the inter-company loan agreement, and extending its tenure.  The potential for that liability was EXACTLY the reason that the one-year limitation was put in place at the time of closing."  (PX31 at ALCOA_RANK0028949.)  A few days later, on November 7, 2011, Cole provided the SII's Final Notice to Laun.  (*See id.* at ALCOA_RANK0028948.)  Cole explained Rank's position that the Final Notice "makes it clear that the offending act to the Chilean authority was the original loan (disguised dividend) made by Alcoa" and thus the Chilean Tax is Alcoa's responsibility.  (*Id.*)

On November 18, 2011, Rank formally provided Alcoa with the Final Notice and reiterated its demand for indemnification of the Chilean Tax as well as the costs and expenses

associated with the indemnification dispute. (PX32 at RANK0001000-01.) On February 2, 2012, Alcoa responded to Rank's letter, restating its position that it is not obligated to indemnify Rank for the Chilean Tax. (PX33.) On May 11, 2012, Rank initiated this lawsuit by filing its Complaint. (Doc. 1.)

### III.    Conclusions of Law

I am satisfied that I have subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of a State and a citizen of a foreign state and involves an amount in controversy in excess of $75,000. (*See* Jt. Fact Stip. ¶¶ 1–2.) The parties do not dispute personal jurisdiction and venue, (*see* PX6 § 17.11; *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.")), and prior to trial the parties stipulated that New York law governs Rank's claims, (Jt. Law Stip. ¶ 1; *see also* PX6 § 17.12).[28]

#### A.    *Tax Indemnification – Section 13.01 of the Acquisition Agreement*

Rank's claim for indemnification is based on a breach of contract theory. Rank claims that Section 13.01(a) of the Acquisition Agreement obligated Alcoa to indemnify Rank for the Chilean Tax, and that Alcoa therefore breached the Acquisition Agreement by failing to fulfill that obligation. Rank asserts that it has stated a prima facie case that it is owed indemnification under both Sections 13.01(a)(i) and 13.01(a)(iv) of the Acquisition Agreement. With respect to Section 13.01(a)(i), Rank argues that it states a prima facie claim for indemnity because the Chilean Tax was "imposed on or with respect to any Transferred Subsidiary [such as Alusud

---

[28] "Jt. Law Stip." refers to Section I, Stipulations of Law, of the Stipulations of Law and Fact attached as Appendix A to the parties' Joint Pretrial Order. (Doc. 86-1.)

Chile] . . . with respect to any Pre-Closing Date Tax Period [in other words, the portion of 2008 preceding closing]". (*See* PX32 at RANK0001007-08 (describing imposition of Chilean Tax for 2008 Loan entered on January 29, 2008).)[29] Likewise, Rank asserts that it states a prima facie claim for indemnity under Section 13.01(a)(iv) because the Chilean Tax "aros[e] from or [was] attributable to a[] Post-Signing Restructuring Action," in this case, the 2008 Loan. (*See* PX6 § 13.01(A)(iv), 7.03 ("Post-Signing Restructuring Actions"); *see also id.* at ALCOA_RANK0013687, ALCOA_RANK0013847-52.) In other words, Rank has alleged and established a causal connection between the Chilean Tax and the 2008 Loan. *Cf. In re Lehman Bros. Inc.*, 519 B.R. 434, 443 (Bankr. S.D.N.Y. 2014) (noting that "typically the terms 'arising from' . . . imply a causal connection").

Alcoa does not argue that Sections 13.01(a)(i) and 13.01(a)(iv) do not, without reference to other sections of the Acquisition Agreement, provide a basis for Rank's indemnification claims. (*See generally* Alcoa Mem.; Alcoa Findings; *see also* Tr. 391:8-16 (Laun acknowledging during his testimony that the Chilean Tax is within Rank's prima facie indemnification rights).)[30] Instead, Alcoa asserts that it is not liable because the Section 13.01 Carve-Out eliminates its indemnification obligation for taxes "attributable to or resulting from . . . a breach by [Rank] . . . or, after the applicable Closing, by any of the Transferred Subsidiaries, of any Tax-related covenant contained in this Agreement." (PX6 § 13.01(a); Jt. Fact Stip. ¶ 25; *see also, e.g.*, Alcoa Findings ¶ 141.) Alcoa further argues that the Chilean Tax arose from Rank's breach of Section 9.02—the Assumed Liabilities covenant—which Alcoa

---

[29] Under the terms of the Acquisition Agreement, the Chilean Tax was assessed "with respect to a[] Pre-Closing Date Tax Period." (*See* PX6, Annex 1 at ALCOA_RANK0013568 ("Pre-Closing Date Tax Periods"), ALCOA_RANK0013570 ("Straddle Tax Period"); *see also* PX6 § 13.01(c); Jt. Fact Stip. ¶¶ 16, 31.)

[30] "Alcoa Findings" refers to Defendant Alcoa Inc.'s Proposed Findings of Fact and Conclusions of Law. (Doc. 117.)

argues is a "Tax-related covenant" that triggers the application of the Section 13.01 Carve-Out.

"[I]ndemnification clauses (like most other contractual provisions) should be read to implement the parties' intentions, to the extent possible." *Bank of N.Y. Trust Co. v. Franklin Advisors, Inc.*, 726 F.3d 269, 283 (2d Cir. 2013). New York law requires that indemnification clauses "be strictly construed so as not to read into [them] any obligations the parties never intended to assume." *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990); *see also Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 549 N.Y.S.2d 365, 365 (1989). The party seeking indemnification must show that the specific language of the contract entitles it to indemnification, *Zastenchik v. Knollwood Country Club*, 955 N.Y.S.2d 640, 640 (2d Dep't 2012), and must prove by a preponderance of the evidence that it is entitled to indemnification, *V.S. Int'l S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994). However, a party who seeks to invoke a contractual exception to liability and indemnification has the burden of proving that the exception applies. *See Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("[W]hen a defendant alleges that a plaintiff's breach of a warranty contained in the contract excuses the defendant's nonperformance, the defendant has the burden of proving that defense."); *see also* 29 George Blum et al., American Jurisprudence Evidence § 176 (2d ed. 2018) ("A party seeking to take advantage of an exception to a contract is charged with the burden of proving facts necessary to come within the exception.").

The parties agree that for the Section 13.01 Carve-Out to apply in this case, I must find the following: (1) that Section 9.02 is a "Tax-related covenant;" (2) that Rank breached Section 9.02; and (3) that the Chilean Tax was "attributable to or resulting from" that breach. (*See* Alcoa Findings ¶ 141; Rank Findings ¶ 17.)[31] I find that Alcoa has met its burden to prove each of

---

[31] "Rank Findings" refers to Plaintiff's Proposed Findings of Fact and Conclusions of law. (Doc. 118.)

these elements.  I discuss each of these requirements in turn below.

## B.  *Section 9.02 is a "Tax-related covenant"*

The Section 13.01 Carve-Out only applies to breaches of "Tax-related covenant[s]".

Section 9.02 of the Acquisition Agreement requires that Rank cause Alusud Chile and ALAHC

to "duly, promptly and faithfully pay, honor, perform and discharge" Assumed Liabilities,

including the 2008 Loan.  (*See* Jt. Fact Stip. ¶ 19 (stating that the 2008 Loan is an Assumed

Liability).)  Although the parties agree that the 2008 Loan was an Assumed Liability, they

disagree about whether Section 9.02 is a "Tax-related covenant" within the meaning of the

Section 13.01 Carve-Out.

To resolve this dispute, I first must determine the parties' intended meaning of "Tax-

related covenant."  Basic principles of contract interpretation govern this inquiry.

> Under New York law, the fundamental, neutral precept of contract
> interpretation is that agreements are construed in accord with the parties'
> intent.  Typically, the best evidence of intent is the contract itself; if an
> agreement is complete, clear and unambiguous on its face, it must be
> enforced according to the plain meanings of its terms.

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.

2004) (internal citations and quotation marks omitted).  The intent of the parties is "revealed by

the language and structure of the contract, giving terms their plain meaning." *Frontline*

*Commc'ns Int'l Inc. v. Sprint Commc'ns Co.*, 178 F. Supp. 2d 432, 436 (S.D.N.Y. 2001) (citation

omitted).  Accordingly, when a term is not defined in the contract, it is appropriate to look to its

ordinary usage or plain meaning, as well as to the contract as a whole, to determine the parties'

intent. *See Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010); *A.X.M.S. Corp.*

*v. Friedman*, 948 F. Supp. 2d 319, 332 (S.D.N.Y. 2013); *Frontline Commc'ns*, 178 F. Supp. 2d

at 436.  In doing so, it is a basic principle of contract interpretation that a contract should be, if

possible, interpreted to give meaning to every provision. *See, e.g.*, *N.Y. Univ. v. Galderma Labs., Inc.*, 689 F. App'x 15, 16 (2d Cir. 2017) (summary order) (stating that, pursuant to the normal rules of contract interpretation under New York law, "a contract should be construed so as to give full meaning and effect to all of its provisions") (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016)); 11 Samuel Williston, Williston on Contracts § 32.5 (4th ed. 1999) ("To the extent possible, and except to the extent that the parties manifest a contrary intent . . . every word, phrase or term of a contract must be given effect."). Moreover, courts should avoid interpretations that would render a term or terms superfluous or meaningless. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005); *see also Katel*, 607 F.3d at 64. Parties advised by sophisticated lawyers are "presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning." *Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000).

If, however, "a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," the contract is ambiguous. *Eternity Global Master Fund*, 375 F.3d at 178 (citation omitted); *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("The meaning of a contract term that is susceptible to at least two reasonable interpretations is generally an issue of fact, requiring the trier of fact to determine the parties' intent."); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) ("[T]he presence or absence of ambiguity is determined by looking

within the four corners of the document, without reference to extrinsic evidence."). A contract is not ambiguous simply because the parties argue in favor of different interpretations; instead, ambiguity "is the inadequacy of the wording to classify or characterize something that has potential significance. A contract may be ambiguous when applied to one set of facts but not another." *Eternity Global Master Fund*, 375 F.3d at 178 (internal quotation marks omitted). This is true, at least in part, because ambiguity with respect to a contractual term can arise from the inferences that can be drawn from and implications of the language of the contract, as well as from the language itself. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). If a contract is found to be ambiguous, courts may look to extrinsic evidence to ascertain the correct and intended meaning of a term. *Eternity Global Master Fund*, 375 F.3d at 177–78; *see also Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 517 (2d Cir. 2001).

With these principles in mind, I first examine whether the Acquisition Agreement is clear on its face as to the meaning of "any Tax-related covenant contained in this Agreement". While I find that a "Tax-related covenant" is one that is connected to Tax (as defined in the Acquisition Agreement), I cannot determine the parties' intended scope of this connection or whether specific covenants are included in this definition based on the language and structure of the Acquisition Agreement alone. Accordingly, it is appropriate for me to consider extrinsic evidence when determining whether a particular covenant is included within the scope of the term "Tax-related".[32]

---

[32] Alcoa argues that the Acquisition Agreement is "ambiguous as to which covenants fit within the scope of the phrase 'any Tax-related covenant contained in this Agreement.'" (Alcoa Mem. at 14 (quoting *Alexander & Alexander*, 136 F.3d at 86).) While Rank contends that the term "any Tax-related covenant contained in this Agreement" "refers to covenants by Rank that by the [Acquisition] Agreement's express terms relate to taxes," (Rank Mem. at 13), it does not unequivocally state that that phrase is unambiguous. In fact, neither the term "ambiguous" nor "unambiguous" appear in Rank's post-trial memorandum's discussion of the phrase "Tax-related covenant", (*id.* at 12–15), and Rank references prior drafts of the Acquisition Agreement, and its negotiations with

As an initial matter, "Tax-related covenant" is not defined in the Acquisition Agreement. (*See* Tr. 365:20-21; Rank Findings ¶ 25; Alcoa Findings ¶ 143.)[33]  In the absence of a contractual definition, I look to the plain meaning of the terms at issue in determining whether the meaning of "Tax-related" is unambiguous.

"New York courts will commonly refer to dictionary definitions in order to determine [the plain and ordinary] meaning" of words and phrases.  *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014); *see also Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988).  Alcoa argues that "related" means "connected in some way," (Alcoa Findings ¶ 153), and, similarly, "connected or having relation to something else," (*id.* ¶ 154), and that "Tax-related" thus means "connected in some way" to tax, (*id.* ¶ 152).  Rank offers a more specific definition for the term "related," arguing that it means "connected by reason of an established or discoverable relation," (Rank Findings ¶ 27), which it argues supports finding that a covenant is "Tax-related" if "the Agreement's language connects the covenant to tax"; therefore, according to Rank, it is only under that definition that an "established or discoverable relation" can be determined based on the terms of the Acquisition Agreement itself, (*id.* ¶ 28).[34]  In other words, Alcoa argues, in essence, that the covenant must be, practically speaking, connected to tax to be "Tax-related" and Rank argues, in essence, that there must be something in the Acquisition Agreement's language that connects the covenant to tax.

---

Alcoa in its post-trial memorandum, as part of its discussion of the phrase, (*id*. at 13–14).

[33] There is no question that the Chilean Tax is a "Tax" as defined in the Acquisition Agreement.  (*See* PX6, Annex 1 at ALCOA_RANK0013571.)

[34] In addition to the definition offered by Alcoa, the Oxford English Dictionary defines "related" "[a]s the second element in compounds formed with a noun"—such as "Tax-related"—as "having a connection or relation (sometimes causal) to the thing specified."  *Related*, Oxford English Dictionary, http://www.oed.com/view/Entry/ 161808?redirectedFrom=related#eid.  In other words, under this definition a "Tax-related covenant" is a covenant that, at least sometimes, has a causal connection to a tax.

Rank argues that its definition is "more consistent with the plain meaning of 'Tax-related covenant'" because it allows the reader to determine whether a covenant is Tax-related "by looking at the terms of the Acquisition Agreement itself"—to determine a "discoverable relation"—whereas Alcoa's definition requires examination of external facts and subsequent events. (Rank Findings ¶ 28.) Rank's argument appears to put the proverbial cart before the horse, because under the relevant case law I must first determine whether the contract itself is ambiguous rather than reverse engineer to make that determination. If I determine the contract is ambiguous I then look to extrinsic evidence to determine meaning.[35] Moreover, the Acquisition Agreement does not support Rank's narrow reading. Therefore, I find that the Acquisition Agreement does not by itself define the meaning of "Tax-related covenant" but suggests a broad meaning such that consideration of extrinsic evidence to determine the specific scope of the term is appropriate. I reach this conclusion for a variety of reasons.

*First*, reading the Section 13.01 Carve-Out in the context of the other provisions in which the phrase "Tax-related covenant" appears suggests that the scope of "Tax-related" was intended to be broad. The term "Tax-related covenant" appears two times other than in the Section 13.01 Carve-Out: (1) in the provision obligating Rank to indemnify Alcoa for taxes "resulting from a breach of any Tax-related covenant contained in this Agreement," (PX6 § 13.01(b)); and (2) in the provision providing that Alcoa must indemnify Rank for taxes "resulting from a breach [by Alcoa] of any Tax-related covenants contained in this Agreement (including, for the avoidance of doubt, the covenants contained in Section 7.03)," (*id.* § 13.01(a)(ix)). Section 13.01(b)

---

[35] This does not mean that Rank's definition—having an "established or discoverable relation"—is not a reasonable interpretation of the term "related". Instead, where Rank's argument falls short is in suggesting that this definition requires that the term be defined with reference to the Acquisition Agreement only. The parties could have, and indeed I find that they did, intend that a covenant have a relation to tax that is discoverable or established with reference to circumstances not described explicitly in the Acquisition Agreement.

explicitly carves out from Rank's indemnity obligations, among other things, breaches of "any covenant contained in Section 14.02," which is entitled "Certain Tax Covenants".  To render the word "certain" meaningful, there must be (1) a broader set of provisions that are "Tax Covenants" and (2) a broader still set of provisions that are not specifically "Tax Covenants" but are "Tax-related covenants".  Furthermore, Section 13.01(a)(ix) explains that Tax-related covenants at least include those contained in Section 7.03—which are related to the Post-Signing Restructuring Actions—and the "for the avoidance of doubt" language confirms that there are Tax-related covenants beyond those in Section 7.03; if it were otherwise, this language would be superfluous, and the parties would have merely explicitly defined Tax-related covenants.[36]  None of these provisions expressly limits the scope of "Tax-related".

*Second*, the parties, on a number of occasions, including with respect to the provisions containing the phrase "any Tax-related covenant in this Agreement," demonstrated their ability to reference specific provisions if they decided to do so.  (*See, e.g.*, PX6 § 13.01(b) (referencing, among other things, Section 14.02, the "Certain Tax Covenants" provision).)  The parties easily could have defined the term "Tax-related" with reference to specific provisions of the Acquisition Agreement, but did not.  Moreover, as a corollary to this point, the Acquisition Agreement does not make explicit which covenants or types of covenants are not "Tax-related".

*Third*, ascribing a broad meaning to "Tax-related" does not mean that I read certain words of phrases out of the Acquisition Agreement.  Rank is correct that "any Tax-related

---

[36] Rank argues that the "for the avoidance of doubt" language "makes clear that [the covenants in Section 7.03] are at the outer reaches of the term 'Tax-related covenant,' even though some of them clearly involve tax matters, which Section 9.02 does not."  (Rank Supp. Mem. at 3.)  Rank's argument assumes that the term Tax-related covenant includes more than just provisions that explicitly say "tax-related" or mention the word "tax".  In any event, while Rank identifies one possible meaning of "for the avoidance of doubt," I find that it is more probable in the context of the other terms of the Acquisition Agreement that the phrase reflects the parties' understanding that Section 7.03 was a particularly important Tax-related covenant.  "Rank Supp. Mem." refers to Plaintiff's Response to Defendant's Post-Trial Brief.  (Doc. 125.)

covenant" cannot mean any covenant that conceivably has an effect on taxes because such a meaning would render "Tax-related" surplusage in the context of Section 13.01's carve-out for tax indemnification. (*See* Rank Mem. at 54–56.) However, I avoid such an untenable reading by defining "Tax-related covenants" as only those that the parties understood and intended to have a connection to tax, referring only to what the parties understood and intended to have a connection to tax. Accordingly, I necessarily look to extrinsic evidence to determine whether a particular covenant is "Tax-related."

*Finally*, I am not persuaded that the language or structure of the Acquisition Agreement requires that I find that "Tax-related" covenants are only those covenants that expressly reference taxes or that the Acquisition Agreement expressly defines as such. Rank offers a number of examples of covenants that "expressly connect[] to tax," including Sections 7.03, 10.08(i), 14.01(b), 14.01(c), 14.01(e), 14.02, 14.03(b), 14.09(ii), and 14.09(iii). The fact that these covenants are "Tax-related" does not mean that a third category of covenants—such as those that the parties understood to have tax consequences—cannot be "Tax-related".

Having found that I must look to extrinsic evidence because, applied to the facts of this case, "Tax-related covenant" is ambiguous, I now turn to the question of whether the evidence in the record supports finding that Section 9.02 was in fact tax-related. I find that it does.

In negotiating the agreement, the parties specifically modified the Section 13.01 Carve-Out to broaden its application. In the November 19, 2007 draft Acquisition Agreement, Alcoa's release from indemnification was limited to Rank's breach of the "Tax Covenants" contained in Section 14.02. (*See* DX117 at 81 ("[Alcoa] shall not be liable under this Section 13.01 for any liability to the extent attributable to or resulting from . . . a breach by [Rank] . . . of any covenant contained in Section 14.02.").) By the time of the circulation of the December 3, 2007 draft, the

language was broadened to reflect the language in the final version of the Acquisition Agreement.  (*See* DX129 at 85 ("[Alcoa] shall not be liable under this Section 13.01 for any liability to the extent attributable to or resulting from . . . a breach by [Rank] . . . of any Tax-related covenant contained in this Agreement."); *see also* PX6 § 13.01(a).)  While this drafting history does not mean that Section 9.02 *must* be included in the definition of "Tax-related covenant" it does demonstrate that the parties (1) revised the language in Section 13.01 to make the carve-out more expansive, (2) intended "Tax-related covenant" to be broader than Section 14.02 (which was, during the drafting process, alternatively titled "Purchaser Tax Covenants" and "Tax Covenants"), (3) rejected delineating the specific covenants that would be Tax-related, and (4) added a specific term—"Tax-related"—that they chose to leave undefined.

The parties were aware when they signed the Acquisition Agreement that the Assumed Liabilities referenced in Section 9.02 carried with them potential or actual tax issues.  In particular, the parties understood that the 2008 Loan was an Assumed Liability under the Acquisition Agreement and carried with it a $10 million deferred tax liability.  (*See* Tr. 133:1-10, 138:9-23, 191:20-192:5, 193:17-196:5, 472:2-8.)  Both Rank and Alcoa also understood that the 2008 Loan and other elements or results of the Post-Signing Restructuring Actions that Rank would be acquiring as Assumed Liabilities might have tax consequences.  (*See, e.g.*, PX2A; DX10; DX14; DX17.)  In other words, the parties understood, at the time they entered into the Acquisition Agreement, that a number of the Assumed Liabilities, and specifically the 2008 Loan, were intimately connected to tax.  The parties also understood that Rank's post-Closing actions with respect to the Assumed Liabilities would have a direct impact on taxes.  Indeed, the record shows that the parties focused substantial attention on this issue.

Section 7.03, which relates to Post-Signing Restructuring Actions, is a "Tax-related

covenant". (*See* PX6 § 13.01(b).) Specifically, the agreement of the parties to "cooperate in good faith in respect of any Post-Signing Restructuring Action" is a Tax-related covenant. (*See id.* § 7.03(b).) Alcoa argues that it would be odd for the parties to have considered an agreement to cooperate in good faith regarding the 2008 Loan as being a "Tax-related covenant" "while at the same time . . . [considering] Rank's Section 9.02 obligation to 'pay, honor, perform and discharge' the very same 2008 Loan . . . 'non-Tax-related.'" (Alcoa Findings ¶ 169.) While I agree such a reading is strained and not compelling, this is not the only fact that supports a finding that Section 9.02 is a Tax-related covenant. When this reading is considered in light of the parties' broadening of the Section 13.01 Carve-Out during the period in which they also considered an array of potential consequences arising from Rank's assumption of various liabilities, it lends further support to finding that Section 9.02 was in fact "Tax-related".

## C. *Rank Breached Section 9.02*

Based on the evidence presented at trial, I find that Rank did not cause Alusud Chile and ALAHC to "duly, promptly and faithfully pay, honor, perform and discharge" the 2008 Loan, and in failing to do so, Rank breached Section 9.02.

The parties agree that the 2008 Loan was an Assumed Liability under the Acquisition Agreement. (Jt. Fact Stip. ¶ 19; *see* PX6 § 2.02(b).) There is no dispute that Rank did not "pay" the 2008 Loan either before or after the SII recharacterized the loan. Indeed, the testimony at trial unequivocally demonstrates that Rank never intended to pay the 2008 Loan. (*See* Tr. 140:3-6, 156:17-157:6, 158:4-8, 169:4-13.) Instead, after Rank was not able to find what it considered a commercially viable way to unwind the 2008 Loan "that would not trigger an immediate tax obligation or saddle Rank with a future obligation to pay tax on Alcoa's accumulated (and withdrawn) profits"—as it had with other loans—(*see* Rank Mem. at 24–25;

Rank Supp. Mem. at 2–3)—Rank amended the terms so that the loan would not be unpaid past-maturity. It is not clear from the record why Rank amended the terms of the loan when it never intended to repay the loan.

The amendment of the 2008 Loan did not relieve Rank of its obligations to Alcoa to "pay, honor, perform and discharge" the 2008 Loan. The parties to the Loan Agreement and the Loan Amendment were Rank subsidiaries post-Closing and thus the Loan Amendment was executed in a transaction that was not done at arm's length. Rank's control of both parties to the Loan Agreement means that Rank, practically speaking, could amend the Loan Agreement at any time. (*See, e.g.*, Tr. 141:9-24.) Thus, while the record does not contain any evidence suggesting that the parties paid specific attention to or negotiated the language of Section 9.02, (*compare* PX1 at ALCOA_RANK0008553, *with* PX6 § 9.02), to give each word in the phrase "duly, promptly, and faithfully pay, honor, perform and discharge" meaning, the Transferred Subsidiaries were required to "pay, honor, perform and discharge" an Assumed Liability—here the 2008 Loan—not merely eliminate that liability. If that were not the case, Rank could fulfill its obligation with respect to any intercompany Assumed Liability by simply canceling or indefinitely amending the liability without regard to Rank's obligation to cause its subsidiaries to "duly" and "faithfully" "honor" that liability. *Cf. Bayer Corp. v. Chestnut Acquisition Corp.*, 189 F. Supp. 2d 153, 159 (S.D.N.Y. 2002) (noting that a "covenant to 'perform and discharge' . . . would be entirely meaningless unless it imported something more than the release of the obligation").

The fact that Alusud Chile and ALAHC could amend the 2008 Loan without breaching their obligations to each other (under the Loan Agreement) does not mean that Rank could cause Alusud Chile and ALAHC to amend the 2008 Loan without breaching its separate obligation to

Alcoa (under the Acquisition Agreement).[37]  Even though the parties did not explicitly address whether Rank could amend any of the Assumed Liabilities, the record demonstrates that, in this context, the amendment and failure to pay the 2008 Loan constitutes a breach of the Section 9.02 covenant.  The record is clear that prior to signing the Acquisition Agreement, Rank was aware of Deloitte's advice that "effective[] and timely pa[yment]" was important for avoiding recharacterization.  (*See* PX2; PX2A.)  Rank also was aware at Closing that the 2008 Loan would require payment within one year, that "[o]utstanding principal and accrued interest will be paid no later than Maturity Date," and that the parties to the 2008 Loan could not renew its term.  (*See* PX37 at RANK0000001–02, 18.)  Indeed, Rank and its advisors were provided with a draft of the Loan Agreement stating these terms.  (*Id.*)  The parties did not discuss the terms of the loan or make any changes, (*see* Tr. 149:14-19, 337:22-338:25, 429:5-430:8, 610:9-19), and thus, at Closing, Rank "assumed" a loan with a one-year term and a provision barring renewal.  While Rank did not agree to assume a loan resulting from the precise mechanisms implemented by Alcoa, Rank did agree to assume and then "pay, honor, perform and discharge" whatever loans Alcoa put in place through the Post-Signing Restructuring Actions.  The 2008 Loan was one such loan, and Rank was aware of the core elements of the loan at each stage in the Acquisition.

In this context, Rank's inability to object to or otherwise request modifications to the Post-Signing Restructuring Actions does not mean that Rank was free to ignore the terms of an Assumed Liability.  The deal that the parties struck was that Rank would assume various loans and other liabilities—the exact contours had been discussed but were not completely settled at

---

[37] The key question is not, as Rank suggests, whether there is a breach of contract when an "agreement has been modified with the mutual assent of both parties and [a] party complies with the terms of the modified contract." (Rank Findings ¶ 20.)  Similarly, the "settled principle" cited by Rank that parties are free to amend contracts even if the contract prohibits amendments by its terms is relevant to whether the Loan Amendment could be enforceable by Alusud Chile or ALAHC, but is not relevant to whether Rank breached its agreement with Alcoa.

signing—related to Alcoa's plan to reduce the amount of cash Rank would be purchasing. Rank specifically negotiated an incentive for Alcoa to undertake as many transactions—like the 2008 Loan—as possible, that would reduce the cash remaining in the Transferred Subsidiaries below $10 million, (*id.* at 54:9-16, 83:16-84:9, 115:4-17; PX6 § 7.03(b)), and the parties agreed that Rank would "pay, honor, perform and discharge" any liabilities related to those transactions. By amending and failing to pay the loan, Rank did not fulfill that obligation.

### D. *The Chilean Tax was Attributable to Rank's Breach of Section 9.02*

For the Section 13.01 Carve-Out to apply, the Chilean Tax must have been "attributable to or resulting from" Rank's breach of Section 9.02. Consistent with this phrase's ordinary meaning and its purpose and usage in the Acquisition Agreement, this means that the Chilean Tax must have derived from the breach.[38] Put differently, the tax must have been a "but for" cause of the breach. *Cf. Bridge Metal Indus., LLC v. Travelers Indem. Co.*, 559 F. App'x 15, 20 n.2 (2d Cir. 2014) (summary order) ("Under New York law, [a breach of contract] exclusion [to an insurance contract] is governed by a 'but for' test, such that the exclusion applies only if the . . . injury suffered . . . would not exist but for the breach of contract." (internal quotation marks and alterations omitted)); *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623 n.15 (2d Cir. 2001) (stating that the "'but for' test governs exclusion clauses such as one excluding from coverage injuries "arising out of breach of contract").

Accordingly, for Alcoa to prevail, Alcoa must show that the tax would not have occurred absent the breach. *See Sarkis v. Ollie's Bargain Outlet*, 560 F. App'x 27, 30 (2d Cir. 2014) (summary order). Rank argues that Alcoa cannot sustain this burden because the "necessary"

---

[38] *See, e.g.*, *Attributable*, Oxford English Dictionary, http://www.oed.com/view/Entry/12928?redirectedFrom =attributable#eid (defining "attributable" as "capable of being attributed or ascribed"); *see also Resulting*, Oxford English Dictionary, http://www.oed.com/view/Entry/164072?isAdvanced=false&result=2&rskey=QoXF4d& (defining "resulting" as "arising, produced or obtained as a result; . . . consequent").

and "sufficient" reasons for recharacterization were in place on the Closing Date as it was the fact of the 2008 Loan itself rather than Rank's failure to perform its obligations with respect to the loan that led to the Chilean Tax. (*See* Rank Mem. at 59–60, 63–65; Rank Supp. Mem. at 6.) I disagree. Instead, I find Alcoa has met its burden to show by a preponderance of the evidence—that it is more probable than not—that the Chilean Tax would not have occurred but for Rank's failure to pay the 2008 Loan. Therefore, the Chilean Tax was "attributable to or resulting from . . . a breach . . . of [Section 9.02, which is] . . . a[] Tax-related covenant contained" in the Acquisition Agreement. (*See* PX6 § 13.01(a).)

There are several key elements and events that are relevant to a determination that Rank's breach of the Acquisition Agreement caused the Chilean Tax. First, Alcoa undertook the 2008 Loan as part of the Post-Signing Restructuring Actions that the parties agreed to in the Acquisition Agreement. Second, Rank assumed the loan at Closing, did not pay the loan, and requested a refund on losses associated with the 2008 Loan. Third, the refund request triggered the Audit, which specifically focused on the 2008 Loan. Fourth, the SII made clear during the Audit that its initial view was that the 2008 Loan should be recharacterized. Fifth, even though Rank did not want, or ever intend, to pay the 2008 Loan, it amended the Loan Agreement to eliminate terms that reduced the risk of recharacterization. Sixth, Rank did not mount a strong defense of the 2008 Loan during the Audit, and the SII had no reason to deviate from its initial view that the loan should be recharacterized. Seventh, Rank then settled with the SII and paid the Chilean Tax. Eighth, at various points during and after the Audit, Rank claimed indemnification from Alcoa.

In finding that the refund request led to the Audit, I do not give substantial weight to Rank's suggestion that the Audit may have occurred even absent the refund request. While

Rank's expert, Stein, testified that Alusud Chile's status as a large taxpayer and a subsidiary of an international corporation meant that Alusud Chile would "typically [be] reviewed in a bit more detail" and would be part of a program of "regular reviews," (Tr. 644:10-20), these speculative statements do not undercut the SII's clear statement, consistent with Chilean law, (*id.* at 643:4-13, 676:13-17, 739:17-741:7), that it conducted the Audit because of the refund request, (DX116 at 21, ¶ 13; *id.* at 22, ¶ 15). Likewise, the fact that Alusud Chile had been audited before does not mean, necessarily, that it would be audited again or that the Audit was not caused by the refund request. Even if Alusud Chile would have been audited at a different time, the Audit arose from a refund request related to the 2008 Loan and, as the SII notes in its Final Notice, the purpose of the Audit "was to validate transactions related to loans made by" Alusud Chile. (PX32 at RANK0001007.) There is no basis for me to find that a hypothetical audit conducted for some other reason at some future date would have resulted in such a close examination of the 2008 Loan.

In any event, I find that it is more probable than not that had Rank "duly, promptly and faithfully pa[id], honor[ed], perform[ed] and discharge[d]" the 2008 Loan, the SII would not have determined to recharacterize the loan. Both parties elicited substantial testimony at trial and submitted expert reports addressing this point.[39] Having reviewed this evidence, I credit the testimony of Alcoa's experts, Barros and Perez, that the 2008 Loan would not have been recharacterized if it had been paid. (*See* Tr. 703:6-15, 708:22-709:11, 710:3-19, 712:22-24,

---

[39] Prior to trial, the parties stipulated that the version of Article 21 of the Chilean Income Tax Law that was in effect in 2008 governs whether the 2008 Loan was subject to recharacterization as a taxable withdrawal of profits. (Jt. Law Stip. ¶ 2; *see* PX49.) The relevant portion of Article 21 states that "loans that companies not organized as corporations make to their partners who are natural persons or taxpayers of withholding tax which are not natural persons, when, in this latter case, the [Chilean] Internal Revenue Service determines that the loan is a hidden withdrawal of taxable profits, which shall have the same tax treatment of withdrawals." (PX49 at 1.) As Stein explained, that provision allowed the SII to recharacterize a loan from a Chilean company, such as Alusud Chile, to a non-Chilean entity, such as ALAHC. (Tr. 639:10-16.)

714:1-4, 739:13-16.)  I credit this testimony for several reasons:

(1) The importance of repayment is consistent with the fact that, had the 2008
Loan been repaid, it would not have been a permanent distribution of profits
to Alusud Chile's non-Chilean parent; the cash would have been back in
Chile—the logical and practical concern of the SII and the Chilean
government.  Moreover, it is also consistent with Stein's testimony, which I
credit,[40] that the purpose of Article 21 is to prohibit practices that avoid the
"second-level" tax on corporate dividends.  (*Id.* at 647:6-15; *see also id.* at
709:16-18.)

(2) The importance of repayment is also consistent with Rank's and Alcoa's
advisors' advice, as well as the testimony of the experts at trial, that to avoid
recharacterization of a subsidiary-parent loan the loan should contain
characteristics of a true or bona fide loan—(*see id.* at 708:11-21)—in other
words, indicia that the loan was going to be honored and repaid.  While the
Loan Agreement contained some terms that increased the risk of
recharacterization, it also contained terms that Rank's and Alcoa's advisors—
along with Perez, (*see* DX83 at 6 (highlighting documentation, payment of the
stamp tax, a market interest rate, a fixed maturity date, and repayment at
maturity as factors "generally consider[ed]" by Chilean practitioners))—
agreed would reduce that risk.  Rank's failure to repay the loan negated the
effect of those important terms, and eliminated any plausible argument Rank

---

[40] I found both parties' experts to be generally credible.  Having said that, I give weight to or rely on specific pieces of expert testimony and reports insofar as that testimony is consistent with the other evidence in this case, including the documents at issue and the testimony of other experts.

could make that the loan was not a distribution of profits.

(3) Rank's expert, Stein, agreed that repayment would militate against recharacterization. (Tr. 651:18-21 (repayment "can be one of the factors"), 696:9-18 (repayment would be a factor in favor of avoiding recharacterization).) Stein admitted that it would be difficult to say what the decision would have been had the loan been repaid. (*Id.* at 665:23-666:3.)

While I assign some weight to the SII guidance presented at trial, (PX41), I do not consider the guidance persuasive evidence concerning what the SII would have done had the 2008 Loan been repaid by Rank. Article 21 does not include any explicit factors or standards governing recharacterization, (*see* PX49; *see also* Tr. 649:17-22), and the SII has discretion under the statute in making a determination regarding recharacterization, (*see* Tr. 649:25-650:8, 722:13-19). In other words, the determination is done on a case-by-case basis. Accordingly, although the SII guidance regarding Article 21 states that SII may still recharacterize a loan if that loan has been repaid, (*see* PX41 at 2–3), as Stein explained, that does not mean that it will do so without "consider[ing] all of the facts and circumstances of that case to reach the conclusion," (Tr. 655:11-15).[41] The SII did not articulate what those facts and circumstances may be and I decline to speculate as to whether they may be applicable in this case.

I also do not assign substantial weight to Stein's suggestion that the SII seized this chance to invoke Article 21 because of Alusud Chile's historical practices—and would have done so regardless of repayment. It is clear from the evidence put forth at trial that the SII was concerned about Alusud Chile's historical practices, but had not, until the Audit, been able to tax prior

---

[41] Stein's testimony was also consistent with the viewpoints provided by Deloitte and Baker. Both advisors explained the factors relevant to their analysis in terms of tax risk—neither purported to eliminate the risk entirely. That does not mean, however, that in this case, the fact of the subsidiary-parent loan itself led to recharacterization.

profit distributions. (*See, e.g.*, *id.* at 664:3-22, 679:24-680:4, 700:11-18; *see also* PX32 at RANK0001007 ("From the date of incorporation, that is, since 1991, Alusud Chile has accumulated profits in the Taxable Profit Ledger . . . that the partners have never withdrawn."), PX21 at RANK0019562 (Borja explaining that the SII "expressed their disappointment for an international investor that was retiring its profits without paying corresponding taxes"); PX19 (Trans.) at RANK0018704.01 (Miranda observing that the SII had considered "basically the parent, a foreign associate that historically had never been taxed at the local level, took out profits under the guise of a loan, without the intent to return these dividends").) The implications of this evidence, however, are far from clear or compelling. The SII was undoubtedly expressing frustration with Alusud Chile's actions while owned by Alcoa, but I am not persuaded that this means that the SII would have recharachterized the loan in the face of repayment since that would have amounted to the "return of these dividends." At its core Article 21 appears concerned with companies taking cash out of Chile in the guise of loans or some other financial maneuver. The return of cash to Chile through the repayment of the 2008 Loan would have been a powerful and likely dispositive argument against recharacterization. In any event, the SII was still bound to make a "case-by-case" assessment.

In finding that it is more probable than not that the SII would not have recharacterized the 2008 Loan had it been repaid, I also do not put great weight on the fact that the Final Notice and other SII communications do not state repayment as a "reason" for the SII's recharacterization determination. I come to this conclusion based on several factors:

> (1) The Final Notice describes what it terms "reasons" for the recharacterization, but reading this document as a whole, it does not describe the SII's analysis or

provide a definitive basis from which I can determine the SII's reasoning.[42]
The subtext and assumption of the Final Notice—and the Audit itself for that
matter—was that the 2008 Loan was not repaid since the SII cites the terms of
the 2008 Loan and not the Loan Amendment.  In other words, the SII knew
the 2008 Loan had not been repaid.  In addition, although not solely
dispositive to my conclusion with regard to repayment, the evidence also
supports a finding that the SII believed the 2008 Loan was past maturity.

(2) The fact that Alusud Chile settled with the SII at an early stage in the Audit
and did not challenge the SII's underlying recharacterization determination
meant that the SII did not need to explain in detail its analysis of or reasons
for the recharacterization of the 2008 Loan.  While I do not find that Rank, as
Barros opined, "surrender[ed]", the lack of reasons in the Final Notice are
consistent with an early-stage agreement to pay 100 percent of the tax.  In
other words, the SII did not need to flesh out in detail its underlying reasoning
since Rank had already agreed that the 2008 Loan could be recharacterized.

(3)  Borja's testimony that the SII never asked whether the 2008 Loan had been
repaid or whether there was an intention to repay the loan, (Tr. 272:13-
273:14), also is not inconsistent with finding that lack of repayment was in
fact significant to the recharacterization decision.  Because—even assuming
that the SII had a copy of the Loan Amendment, a proposition for which there

---

[42] Stein testified that the text of Article 21 required four conditions for recharacterization:  The first three—(1) "a company organized in a way other than a Chilean corporation", (2) that "determine[d] its taxable income based on accounting records", and (3) "made a loan to one of its direct partners . . . that is not Chilean"—are stated in the Final Notice.  (*See* Tr. 648:1-14; PX32 at RANK0001007-08.)  The fourth—that the "SII needed to make the determination that in that case the loan was a hidden distribution"—is not explained.  (*See* Tr. 648:15-18.)

is no proof other than speculative testimony—the documentation regarding the 2008 Loan before the SII would have consisted solely of an unpaid loan that was nearly two years past its initial maturity. Moreover, even if the Loan Amendment had been provided to the SII, the terms of the 2008 Loan had been modified such that they no longer contained conditions the parties understood to be favorable to avoiding recharacterization. (*See* PX2A at 43; PX8.) In any event, for the reasons stated above, (*see supra*), it is more probable than not that the SII did not have the Loan Amendment. For example, in its Final Notice the SII explicitly references the terms of the 2008 Loan and not the terms of the Loan Amendment. Therefore, the SII would not have needed to ask whether Rank intended to repay because, based on the documentation before it, the SII knew that the 2008 Loan had not been paid. Rank's actions after the recharacterization and its payment of the Chilean Tax also support the conclusion that the SII did not have a copy of the Loan Amendment. Specifically, the Agreement to Render No Effect that Rank caused Alusud Chile and ALAHC to enter into after the recharacterization of the 2008 Loan and Rank's payment of the Chilean Tax only referenced the Loan Agreement and not the Loan Amendment. (*See* DX125.) If Rank had presented the SII with the Loan Amendment as the operative agreement related to the 2008 Loan, it would have referenced the loan terms contained in the Loan Amendment in the Agreement to Render No Effect.

Alcoa has met its burden in showing by a preponderance of the evidence that the status of the 2008 Loan as revealed to the SII in the Audit—that of an unpaid, past initial maturity loan—

led to the SII's recharacterization decision, which led to the Chilean Tax.

### E.     *The Implied Covenant of Good Faith and Fair Dealing*

Under New York law, every contract contains an implied covenant of good faith and fair dealing that prevents the parties from taking actions that would deny another party the benefits of the parties' bargain.  *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991).  Nevertheless, "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."  *Matsumura v. Benihana Nat'l Corp.*, 465 F. App'x 23, 29 (2d Cir. 2012) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). Here, Rank bases its breach of good faith and fair dealing claim on the same operative facts as its breach of contract claim.  (*See* Rank Findings 60–63; Rank Mem. at 65–68 ("Alcoa's attempt to circumvent the clear purpose of the tax indemnification provision and to impose on Rank the tax liability for the $34 million of profits that Alcoa accumulated for years and withdrew from Alusud Chile before the Closing breached Alcoa's implied covenant of good faith and fair dealing.").)  Consequently, Rank's breach of the implied covenant of good faith and fair dealing claim cannot be sustained and must be dismissed.  *See Matsumura*, 465 F. App'x at 29 (affirming dismissal of breach of covenant of good faith and fair dealing claim as duplicative of breach of contract claim where both counts alleged the same facts); *Peabody v. Weider Publ'ns, Inc.*, 260 F. App'x 380, 383 (2d Cir. 2008) (same).

Even if Rank's breach of good faith and fair dealing claim was not legally barred, Rank's cause of action for breach of good faith and fair dealing must be dismissed because Rank received that for which it bargained and contracted.  Rank argues that Alcoa breached the implied covenant by designing the 2008 Loan in a manner that undermined Rank's contractual

right to claim indemnification for "Alcoa's watch"—taxes arising from the Post-Signing Restructuring Actions and/or during the applicable Pre-Closing Tax Period.

Rank has failed to meet its burden to prove this claim for a number of reasons. First, the parties expressly contemplated Alcoa's control over the Post-Signing Restructuring Actions and thus Alcoa's exercise of that control was not in itself a breach of the implied covenant. Second, Rank was actively involved in Alcoa's development of the Post-Signing Restructuring Actions, and was aware of—and agreed to—the Restructure Plan prior to signing. Rank also was aware of the potential consequences of the 2008 Loan prior to signing, and contemplated (and had) discussions with Alcoa regarding the Restructure Plan after signing. Accordingly, even though Rank did not have a contractual right to object to the 2008 Loan, Rank was afforded the opportunity to participate in developing and commenting on its terms. Moreover, Alcoa was incentivized to undertake the 2008 Loan based on a provision in the Acquisition Agreement specifically negotiated for by Rank. Rank cannot say that it did not bargain for this deal. Third, while both parties were trying to avoid triggering and/or paying a tax associated with the withdrawal of cash from Alusud Chile, the fact that Rank was able to "solve" similar loans in other jurisdictions underscores that the parties contemplated a certain level of tax risk associated with the Post-Signing Restructuring Actions. Alcoa took efforts to mitigate that risk by including in the Loan Agreement terms that would minimize the risk of recharacterization. Rank amended those terms knowing full well that the consequences of (1) amending the terms increased the likelihood of recharaterization and (2) failing to "pay, honor, perform or discharge" the 2008 Loan on the terms contemplated by Alcoa might be recharacterization. The fact that Rank could not find what it considered a commercially viable means to unwind the 2008 Loan without triggering a tax, including through recharacterization by the SII, does not amount to a

breach by Alcoa of its duty of good faith and fair dealing.

## IV.    <u>Conclusion</u>

For the foregoing reasons, Alcoa is not obligated to indemnify Rank for the Chilean Tax.

The Clerk of Court is directed to enter judgment in favor of Alcoa and to close the case.

SO ORDERED.

Dated: March 19, 2018
        New York, New York

Vernon S. Broderick
United States District Judge